ALDEN F. ABBOTT
General Counsel
GREGORY A. ASHE
HELEN CLARK
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
Telephone: 202-326-3719 (Ashe)
Telephone: 202-326-2273 (Clark)
Facsimile: 202-326-3768
Email: gashe@ftc.gov, hclark@ftc.gov

NICHOLAS A. TRUTANICH
United States Attorney
LINDSAY AGER
Assistant United States Attorney
Nevada Bar No. 11985
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787
Email: Lindsay.ager@usdoj.gov

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**,<br><br>    Plaintiff,<br><br>    v.<br><br>**LEAD EXPRESS, INC.**, a Nevada corporation;<br>**CAMEL COINS, INC.**, a Nevada corporation;<br>**SEA MIRROR, INC.**, a Nevada corporation;<br>**NAITO CORP.**, a Nevada corporation;<br>**KOTOBUKI MARKETING, INC.**, a Nevada corporation;<br>**EBISU MARKETING, INC.**, a California corporation;<br>**HOTEI MARKETING, INC.**, a California corporation; | Case No.<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

1
2
3
4
5
6
7

**DAIKOKU MARKETING, INC.**, a California corporation;
**LA POSTA TRIBAL LENDING ENTERPRISE,** a tribal lending enterprise, also d/b/a Harvest Moon Financial, Gentle Breeze Online, and Green Stream Lending;
**TAKEHISA NAITO**, in his individual and corporate capacity; and
**KEISHI IKEDA**, in his individual and corporate capacity,

    Defendants.

8
9

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

10  1.  The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission

11      Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the Telemarketing and

12      Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105(b),

13      Section 108(c) of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1607(c), and Section

14      918(c) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c), to obtain

15      temporary, preliminary, and permanent injunctive relief, rescission or reformation of

16      contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other

17      equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act,

18      15 U.S.C. § 45(a), the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, TILA,

19      15 U.S.C. §§ 1601-1666j, and its implementing Regulation Z, 12 C.F.R. Part 1026, and

20      EFTA, 15 U.S.C. §§1693-1693r, and its implementing Regulation E, 12 C.F.R. Part 1005, in

21      connection with the offering and extension of credit in the form of high-fee, short-term

22      "payday" loans.

23

24                          **JURISDICTION AND VENUE**

25  2.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

26
27
28

-2-

3. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (b)(3), and (c)(2), and 15 U.S.C. § 53(b).

**PLAINTIFF**

4. The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts and practices.  The FTC also enforces TILA, 15 U.S.C. §§ 1601-1666j, and its implementing Regulation Z, 12 C.F.R. Part 1026, which establishes, among other things, disclosure and calculation requirements for consumer credit transactions and advertisements.  The FTC also enforces EFTA, 15 U.S.C. §§ 1693-1693r, and its implementing Regulation E, 12 C.F.R. Part 1005, which regulates the rights, liabilities, and responsibilities of participants in electronic fund transfer systems.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, the TSR, TILA and Regulation Z, and EFTA and Regulation E, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 57b, 1607(c), 1693o(c), 6102(c), and 6105(b).

**DEFENDANTS**

6. Defendant **Lead Express, Inc.** ("Lead Express") is a Nevada corporation with its principal place of business at 2780 South Jones Boulevard, Suite 200-3637, Las Vegas, Nevada.  At all

times material to this Complaint, acting alone or in concert with others, Lead Express has advertised, marketed, distributed, or sold the extension of credit in the form of high-fee, short-term "payday" loans to consumers throughout the United States and participated in the collection of those loans.  Lead Express transacts or has transacted business in this District and throughout the United States.

7.  Defendant **Camel Coins, Inc.** ("Camel Coins") is a Nevada corporation with its principal place of business at 2780 South Jones Boulevard, Suite 200-3132, Las Vegas, Nevada.  At all times material to this Complaint, acting alone or in concert with others, Camel Coins has advertised, marketed, distributed, or sold the extension of credit in the form of high-fee, short-term "payday" loans to consumers throughout the United States and participated in the collection of those loans.  Camel Coins transacts or has transacted business in this District and throughout the United States.

8.  Defendant **Sea Mirror, Inc.** ("Sea Mirror") is a Nevada corporation with its principal place of business at 2780 South Jones Boulevard, Suite 200-3692, Las Vegas, Nevada.  At all times material to this Complaint, acting alone or in concert with others, Sea Mirror has advertised, marketed, distributed, or sold the extension of credit in the form of high-fee, short-term "payday" loans to consumers throughout the United States and participated in the collection of those loans.  Sea Mirror transacts or has transacted business in this District and throughout the United States.

9.  Defendant **Naito Corp.** is a Nevada corporation with its principal place of business at 2780 South Jones Boulevard, Suite 200-3132, Las Vegas, Nevada.  At all times material to this Complaint, acting alone or in concert with others, Naito Corp. has advertised, marketed, distributed, or sold the extension of credit in the form of high-fee, short-term "payday" loans

to consumers throughout the United States and participated in the collection of those loans. Naito Corp. transacts or has transacted business in this District and throughout the United States,

10. Defendant **Kotobuki Marketing, Inc.** ("Kotobuki Marketing") is a Nevada corporation with its principal place of business at 2780 South Jones Boulevard, Suite 200-3827, Las Vegas, Nevada. At all times material to this Complaint, acting alone or in concert with others, Kotobuki Marketing has advertised, marketed, distributed, or sold the extension of credit in the form of high-fee, short-term "payday" loans to consumers throughout the United States and participated in the collection of those loans. Kotobuki Marketing transacts or has transacted business in this District and throughout the United States.

11. Defendant **Ebisu Marketing, Corp.** ("Ebisu Marketing") is a California corporation with its principal place of business at 1930 Wilshire Boulevard, Suite 400, Los Angeles, California. At all times material to this Complaint, acting alone or in concert with others, Ebisu Marketing has advertised, marketed, distributed, or sold the extension of credit in the form of high-fee, short-term "payday" loans to consumers throughout the United States and participated in the collection of those loans. Ebisu Marketing transacts or has transacted business in this District and throughout the United States.

12. Defendant **Hotei Marketing, Inc.** ("Hotei Marketing") is a California corporation with its principal place of business at 1930 Wilshire Boulevard, Suite 400, Los Angeles, California. At all times material to this Complaint, acting alone or in concert with others, Hotei Marketing has advertised, marketed, distributed, or sold the extension of credit in the form of high-fee, short-term "payday" loans to consumers throughout the United States and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

participated in the collection of those loans.  Hotei Marketing transacts or has transacted business in this District and throughout the United States.

13. Defendant **Daikoku Marketing, Inc.** ("Daikoku Marketing") is a California corporation with its principal place of business at 1930 Wilshire Boulevard, Suite 400, Los Angeles, California.  At all times material to this Complaint, acting alone or in concert with others, Daikoku Marketing has advertised, marketed, distributed, or sold the extension of credit in the form of high-fee, short-term "payday" loans to consumers throughout the United States and participated in the collection of those loans.  Daikoku Marketing transacts or has transacted business in this District and throughout the United States.

14. Defendant **La Posta Tribal Lending Enterprise**, also doing business as Harvest Moon Financial, Gentle Breeze Online, and Green Stream Lending, is a tribal lending enterprise chartered under the laws of the La Posta Band of Diegueño Mission Indians with its principal place of business at 8 Crestwood Road, Boulevard, California.  At all times material to this Complaint, acting alone or in concert with others, La Posta Tribal Lending Enterprise has advertised, marketed, distributed, or sold the extension of credit in the form of high-fee, short-term "payday" loans to consumers throughout the United States and participated in the collection of those loans.  La Posta Tribal Lending Enterprise transacts or has transacted business in this District and throughout the United States.

15. Defendant **Takehisa Naito** is or was an owner, officer, director, or manager of Lead Express, Camel Coins, Sea Mirror, Naito Corp., Kotobuki Marketing, Ebisu Marketing, Hotei Marketing, and Daikoku Marketing.  He is a signatory on many of Defendants' bank accounts.  He is also the contact person for Defendants' telecommunications services.  At all times material to this Complaint, acting alone or in concert with others, he has formulated,

directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Naito resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

16. Defendant **Keishi Ikeda** is or was an owner, officer, director, or manager of Lead Express, Camel Coins, Sea Mirror, Naito Corp., Kotobuki Marketing, Ebisu Marketing, Hotei Marketing, and Daikoku Marketing.  He is a signatory on many of Defendants' bank accounts.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Ikeda resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

**COMMON ENTERPRISE**

17. Defendants Lead Express, Camel Coins, Sea Mirror, Naito Corp., Kotobuki Marketing, Ebisu Marketing, Hotei Marketing, Daikoku Marketing, and La Posta Tribal Lending Enterprise (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive, unfair, and unlawful acts and practices and other violations of law alleged below.  Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, and that commingled funds.  Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Defendants Naito and

Ikeda have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

**COMMERCE**

18. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANTS' BUSINESS ACTIVITIES**
**Overview**

19. Since at least 2011, Defendants have offered consumers payday loans. "Payday loan" is the common name for a short-term unsecured loan, often made to consumers to provide funds in anticipation of an upcoming paycheck.

20. Defendants claim that consumers will repay their loan obligations with a specific amount using a fixed number of payments. In reality, Defendants typically initiate repeated finance-charge only withdrawals, without ever crediting the withdrawals to consumers' principal balances. As a result, in numerous instances, consumers end up paying significantly more than what Defendants represented they would pay. In addition, in numerous instances, Defendants make it difficult if not impossible for consumers to obtain copies of their loan agreements or contact Defendants to discuss the loan terms or pay off their loans.

21. Defendants also routinely fail to make required credit transaction disclosures. Additionally, when processing loan payments, Defendants routinely engage in electronic fund transfers from consumers' bank accounts without obtaining proper authorization. And Defendants unlawfully use remotely created checks to process payments for loans they have offered through telemarketing.

**Defendants' Deceptive Loan Application Process**

22. Defendants offer payday loans in amounts ranging from $50 to $800. Defendants offer those loans to consumers through a series of websites owned, operated, and controlled by entities that are part of the common enterprise. Defendants' websites include harvestmoonloans.com, greenstreamlending.com, and gentlebreezeonline.com.

23. Defendants' websites advertise 14-day term loans. For example, for a $100 loan, Defendants represent that consumers will pay a total of $146.38 that includes the principal with a $45 fee and $1.38 in interest. Similarly, for a $200 loan, Defendants represent that consumers will pay a total of $292.76 that includes the principal with a $90 fee and $2.76 interest. These terms are depicted in two fees charts, as shown below:

## Fees

Fee rate is determined by Applicant qualifications for an Indian Time Loan. See examples below.

*Note: APR and payment amounts may vary slightly based on initial term.  These examples are based on an initial term of 14 days and all payment amounts being the same; the final payment amount is determined by your payment history.*

- At HarvestMoon, you pay interest only for as long as you keep your loan \*\*.    You can make affordable regular payments or pay off your loan early at any time with no prepayment penalty.

\* A successful payment is made on time, for the full amount due, and is not returned (i.e. NSF or bounced).

\*\* If you skip a payment, or if your payment is late, or is returned, you may incur additional fees.  Complete disclosures of APR, fees and payment terms are provided with the Loan Agreement.

### *Indian Time Loan Fees:*

| Principal | Fee | Interest | Total | APR | Principal | Fee | Interest | Total | APR |
|---|---|---|---|---|---|---|---|---|---|
| \$100.00 | \$30.00 | \$1.38 | \$131.38 | 818.1214% | \$100.00 | \$45.00 | \$1.38 | \$146.38 | 1209.1929% |
| \$200.00 | \$60.00 | \$2.76 | \$262.76 | 818.1214% | \$200.00 | \$90.00 | \$2.76 | \$292.76 | 1209.1929% |
| \$300.00 | \$90.00 | \$4.14 | \$394.14 | 818.1214% | \$300.00 | \$135.00 | \$4.14 | \$439.14 | 1209.1929% |
| \$400.00 | \$120.00 | \$5.52 | \$525.52 | 818.1214% | \$400.00 | \$180.00 | \$5.52 | \$585.52 | 1209.1929% |
| \$500.00 | \$150.00 | \$6.90 | \$656.90 | 818.1214% | \$500.00 | \$225.00 | \$6.90 | \$731.90 | 1209.1929% |
| \$600.00 | \$180.00 | \$8.28 | \$788.28 | 818.1214% | \$600.00 | \$270.00 | \$8.28 | \$878.28 | 1209.1929% |
| \$700.00 | \$210.00 | \$9.67 | \$919.67 | 818.1587% | \$700.00 | \$315.00 | \$9.67 | \$1,024.67 | 1209.2301% |
| \$800.00 | \$240.00 | \$11.05 | \$1,051.05 | 818.1540% | \$800.00 | \$360.00 | \$11.05 | \$1,171.05 | 1209.2254% |

The header for the left table reads "\$30 per \$100 for 14 day loan term" and the right table reads "\$30 per \$100 for 14 day loan term".

24. On their websites, Defendants also state that "[w]hen your loan is due, the amount borrowed plus a service fee is debited from your checking account."

25. When consumers apply for a loan, Defendants' websites collect personal information from consumers including name, address, telephone number, Social Security number, driver's license number, employment details, and bank account and routing number information. Using a drop down box, consumers can select the loan amount of between \$50 and \$800 (in \$50 increments).

26. In numerous instances as a necessary part of the loan application process, shortly after entering their information on Defendants' websites, consumers receive a telephone call from Defendants' representatives. Defendants' representatives confirm the information included in consumers' applications. After verifying the information, Defendants typically inform consumers they have been approved for the requested loan.

27. In numerous instances, Defendants' telephone representatives inform consumers that they will pay off the loan with one payment or through a fixed number of payments. Defendants' representatives then provide consumers with instructions on how to log in to Defendants' website to sign electronically a loan document, after which the loan will be funded.

28. In numerous instances, after speaking with consumers on the telephone, Defendants send consumers approval emails that contain instructions for logging in and signing the loan agreements. In some instances, the approval emails also describe different payment options—full payoff, loan extension, and loan buy down. The payoff option begins with "Payback all of the loan amount along with the financial fee" and then states that unless consumers notify Defendants three days in advance that they want to payoff the entire loan amount, Defendants will only debit the financial fee. In numerous instances, however, the approval emails only contain the instructions on how to log in and sign the loan agreement without the payment option language.

29. Regardless of what the email says, when consumers log on, they are shown a document entitled "Consumer Loan Agreement" ("Loan Agreement") and instructed to sign the document electronically. The Loan Agreement identifies the lender as Defendant La Posta Tribal Lending Enterprise and includes a "**Final Payment Due Date**" that is two weeks after the consumer signs the Loan Agreement.

30. Below this information, the Loan Agreement contains a "**TRUTH-IN-LENDING DISCLOSURE**." The Loan Agreement states a "**Total Payments**" figure that constitutes the sum of a stated "**FINANCE CHARGE**" and the "**Amount Financed**." It also states the "**ANNUAL PERCENTAGE RATE**" ("APR") for the loan. These statements appear in bold and prominent text in a box set apart from the rest of the text of the Loan Agreement. The box also contains a payment schedule with "Number of Payments" and other information.

31. For example, for one consumer who borrowed $250 from Defendants on or about November 13, 2018, her Loan Agreement stated:

**TRUTH-IN-LENDING DISCLOSURE**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you | Amount Financed The amount of credit provided to your or on your behalf | Total Payments The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| 1130.92% | $116.19 | $250.00 | $366.19 |

PREPAYMENT: If you pay off the Loan early, you will not have to pay a penalty.

SECURITY INTEREST: Your ACH authorization is security for this loan.

See the Loan Agreement for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment penalties.

| Number of Payments | Principal and Interest | Service Fee | Total Payment | Payment Due |
|---|---|---|---|---|
| 1 | $253.69 | $112.50 | $366.19 | 11/28/2018 |

32. The payment schedule information represented that there would be a single payment on November 28, 2018, for a total amount $366.19, to cover the principal, interest, and service fee for the $250 loan.

33. The box reprinted above is followed closely by a paragraph titled "**PROMISE TO PAY**" and states, in the case of the above example, "[y]ou promise to pay to the order of Lender or any registered assignee of this Agreement the principal sum of $250 plus interest and fees of $116.19." Just below this paragraph, the Loan Agreement contains a paragraph titled

-12-

"**PAYMENTS**" and states "[y]ou promise to pay the amount of the Total of Payments shown above on or before the Payment Due Date."

34. In numerous instances, Defendants effect payment by initiating recurring ACH withdrawals directly from consumers' bank accounts.  In some instances, Defendants create or cause to be created remotely created checks as payments for consumers' loans.

35. In numerous instances, Defendants do not disclose to consumers, clearly and conspicuously in writing, in a form that consumers can keep, the following information before consumers sign the loan documents:  name of creditor, amount financed, finance charge, APR, payment schedule, and total of payments.

36. In numerous instances, Defendants fail to provide consumers with copies of the Loan Agreements consumers have signed.  And in numerous instances, consumers have been unable to log on and obtain copies of their Loan Agreements from Defendants' websites.

**The Actual Cost of Defendants' Loans**

37. In numerous instances, Defendants withdraw more than the total payments represented to them.  Specifically, instead of withdrawing a fixed number of payments to cover both the principal and finance charges as represented, Defendants typically withdraw the finance charge (or approximately that amount) on a continuing basis, without ever decreasing consumers' outstanding principal.

38. The result of this process is that Defendants withdraw from consumers significantly more than the stated total cost of the loan that Defendants represent.

39. In many instances, consumers do not discover that Defendants are continuing to withdraw payments indefinitely in an amount that ultimately exceeds the total number of payments Defendants promised until they review their bank statements.

40. When consumers try to contact Defendants for an explanation of the multiple payments, in numerous instances, they are unable to reach Defendants via e-mail or telephone—either Defendants' telephone numbers ring busy, no one answers, calls are disconnected, or they are transferred to voicemail but no one returns the call.

41. In the instances in which consumers are able to speak with Defendants, Defendants typically reveal that the debits are only a finance charge, their loans have been "refinanced" for an additional pay period per a "refinance policy," and that the full amount financed remains outstanding.

42. Defendants' websites do not mention Defendants' "refinance policy." In addition, in numerous instances, Defendants' representatives do not mention to consumers before consumers sign Loan Agreements the existence or terms of Defendants' "refinance policy." Further, consumers attempting to locate the "refinance policy" in their Loan Agreements are unable to return to their contracts for information because Defendants do not provide them with a copy of the Loan Agreements. Even if consumers had their Loan Agreements, they would only find the "refinance policy" buried eleven paragraphs below the "**PAYMENTS**" paragraph. And even if consumers had their Loan Agreements and found the "refinance policy," they would still not find true information regarding the total payment amount. In its entirety, the two-line "**REFINANCE POLICY**" states "[u]nless otherwise notified, your account will be debited the minimum amount due to refinance this loan for another term."

43. In the example referenced above in which the consumer borrowed $250 on or about November 13, 2018, Defendants' Loan Agreement represented that she would have one payment on November 28, 2018, in the total amount of $366.19, to cover her amount borrowed ($250) and the finance charge ($116.19). In fact, Defendants began making

repeated withdrawals beginning on November 28, 2018, taking approximately $116 from her bank account on that date and every two weeks thereafter.  By the time the consumer realized she was being overcharged and successfully contacted Defendants and threatened to report them to law enforcement if they did not stop, Defendants had withdrawn 12 payments totaling $1,391.64, not a penny of which had been applied to the principal amount of her loan.

44. For numerous consumers, Defendants continue to withdraw the finance charge every two weeks until consumers close their bank accounts, instruct their banks to reject ACH debits or remotely created checks initiated by Defendants, or file complaints with their state attorney general's office or Better Business Bureau.

45. In some instances where Defendants withdraw from consumers' bank accounts more than the total payments represented to consumers and consumers tell Defendants that they may close their bank accounts or instruct their banks to reject ACH debits initiated by Defendants, Defendants have represented that consumers could be prosecuted criminally or face civil lawsuits.  In some instances where consumers did close their bank accounts or instruct their banks to reject ACH debits initiated by Defendants, Defendants have referred consumers' accounts to third parties for collection.

**Defendants Fail to Obtain Consumers' ACH Authorizations**

46. In numerous instances, Defendants process loan payments through recurring electronic fund transfers from consumers' bank accounts.  In numerous instances, Defendants did not first obtain written authorization signed or similarly authenticated by consumers authorizing the recurring electronic fund transfers from their accounts and did not subsequently provide consumers with a copy of such written authorization.

**Ongoing Nature of Defendants' Unlawful Practices**

47. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the FTC.

**VIOLATIONS OF THE FTC ACT**

48. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

49. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**COUNT I**
**Misrepresentations Regarding Loan Repayment**

50. In numerous instances in connection with the marketing or offering of payday loans, Defendants represent, directly or indirectly, expressly or by implication, that:

    a.  Defendants will withdraw from consumers' bank accounts a fixed number of payments to repay consumers' loans;

    b.  Defendants will withdraw from consumers' bank accounts a fixed total of payments to repay consumers' loans; and

    c.  Defendants will withdraw from consumers' bank accounts payments that consist of both interest and principal repayment.

51. In truth and in fact, in numerous instances in which Defendants make the representations set forth in Paragraph 50 above:

    a.  Defendants do not withdraw from consumers' bank accounts a fixed number of payments to repay consumers' loans;

    b.  Defendants do not withdraw from consumers' bank accounts a fixed total of payments to repay consumers' loans; and

c.  Defendants do not withdraw from consumers' bank accounts payments that consist of both interest and principal repayment.

52. Therefore, Defendants' representations as set forth in Paragraph 50 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

53. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

54. Under the TSR, a "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration.  16 C.F.R. § 310.2(dd).  A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.  16 C.F.R. § 310.2(ff).  "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call.  16 C.F.R. § 310.2(gg).

55. Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing," as those terms are defined in the TSR.  16 C.F.R. § 310.2(dd), (ff), and (gg).

56. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).

57. The TSR prohibits sellers and telemarketers from creating or causing to be created, directly or indirectly, a remotely created payment order as payment for goods or services offered or sold through telemarketing.  16 C.F.R. § 310.4(a)(9).  A remotely created payment order includes a remotely created check.  16 C.F.R. § 310.2(cc).

58. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II
## Misrepresentations Regarding Loans

59. In numerous instances in connection with the telemarketing of payday loans, Defendants misrepresent, directly or indirectly, expressly or by implication, material aspects or the performance, efficacy, nature, or central characteristics of their loans, including but not limited to, that:

    a.   Defendants will withdraw from consumers' bank accounts a fixed number of payments to repay consumers' loans;

    b.   Defendants will withdraw from consumers' bank accounts a fixed total of payments to repay consumers' loans; and

    c.   Defendants will withdraw from consumers' bank accounts payments that consist of both interest and principal repayment.

60. Defendants' acts and practices as set forth in Paragraph 59 are deceptive telemarketing acts and practices that violate Section 310.3(a)(2)(iii) of the TSR, 16 C.F.R. § 310.3(a)(2)(iii).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT III
## Unlawful Use of Remotely Created Checks

61. In numerous instances in connection with the telemarketing of payday loans, Defendants create or cause to be created, directly or indirectly, a remotely created check as payment for their loans.

62. Defendants' acts and practices as set forth in Paragraph 61 are abusive telemarketing acts and practices that violate Section 310.4(a)(9) of the TSR, 16 C.F.R. § 310.4(a)(9).

## VIOLATIONS OF THE TRUTH IN LENDING ACT AND REGULATION Z

63. Under TILA, 15 U.S.C. §§ 1601-1666j, and its implementing Regulation Z, 12 C.F.R. § 1026, creditors who extend "closed-end credit," as defined in 12 C.F.R. § 1026.2(a)(10), must comply with the applicable disclosure provisions of TILA and Regulation Z, including, but not limited to, Sections 1026.17 and 1026.18 of Regulation Z, 12 C.F.R. §§ 1026.17 and 1026.18.

64. "Creditor" means a person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no contract.  12 C.F.R. § 1026.2(a)(17).

65. Defendants are creditors under TILA and Regulation Z because they extend consumer credit subject to a finance charge and the obligation is initially payable to them.

66. "Closed-end credit" means consumer credit other than open-end credit, and "open-end credit" is defined as "consumer credit extended by a creditor under a plan in which: (i) the creditor reasonably contemplates repeated transactions; (ii) the creditor may impose a finance charge from time to time on an outstanding unpaid balance; and (iii) the amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the

creditor) is generally made available to the extent that any outstanding balance is repaid." 12 C.F.R. §§ 1026.2(a)(10) and (a)(20).

67. Defendants extend closed-end credit (as opposed to open-end credit) to consumers under TILA and Regulation Z because the loans do not meet all three criteria for open-end credit.

68. Sections 121(a) and 128(b)(1) of TILA, 15 U.S.C. §§ 1631(a) and 1638(b), and Sections 1026.17(a) and (b) and Section 1026.18 of Regulation Z, 12 C.F.R. §§ 1026.17(a) and (b) and 1026.18, require creditors of closed-end consumer credit transactions to disclose, before the credit is extended, clearly and conspicuously in writing, in a form that the consumer may keep, the following with respect to the loan:  amount financed; finance charge; APR; number, amount and due dates or period of payments scheduled to repay the total of payments (*i.e.*, the "payment schedule"); and total of payments.  These disclosures must reflect the terms of the legal obligation between the parties.  12 C.F.R. § 1026.17(c).

69. If any advertisement for closed-end credit states the amount or percentage of the down payment, the number of payments or period of repayment, the amount of any payment, or the amount of any finance charge, then Section 144(a) and (d) of TILA, 15 U.S.C. § 1664(a) and (d), and Section 1026.24(d) of Regulation Z, 12 C.F.R. § 1026.24(d), provides the advertisement shall state all of the following clearly and conspicuously:  the amount or percentage of the down payment, the terms of repayment which reflect the payment obligations over the full term of the loan, and the APR.

70. Defendants' advertisements, including, but not limited to, those described in Paragraphs 22-24, promote closed-end credit, and Defendants are subject to the advertising requirements of TILA and Regulation Z, including Section 1026.24(d) of Regulation Z, 12 C.F.R. § 1026.24(d).

71. Pursuant to Section 108(c) of TILA, 15 U.S.C. § 1607(c), every violation of TILA and Regulation Z constitutes a violation of the FTC Act.

**COUNT IV**
**Failure to Make Required Loan Disclosures**

72. In numerous instances in connection with the extension of closed-end credit, Defendants fail to disclose clearly and conspicuously in writing, in a form consumers may keep, before extending credit, the following information in a manner reflecting the terms of the legal obligation between the parties:

    a.  The amount financed;

    b.  The finance charge;

    c.  The APR;

    d.  The payment schedule; and

    e.  The total of payments.

73. Defendants have thereby violated Sections 121 and 128 of TILA, 15 U.S.C. §§ 1631, 1638, and Sections 1026.17 and 1026.18 of Regulation Z, 12 C.F.R. §§ 1026.17 and 1026.18.

**COUNT V**
**Failure to Make Required Disclosures in Credit Advertisements**

74. In numerous instances in connection with the advertisement of closed-end credit, Defendants' advertisements state the number of payments or period of repayment, the amount of any payment, or the amount of any finance charge, but fail to state the terms of repayment which reflect the repayment obligations over the full term of the loan and the APR.

75. Defendants have thereby violated Section 144 of TILA, 15 U.S.C. § 1664, and Section 1026.24(d) of Regulation Z, 12 C.F.R. § 1026.24(d).

**VIOLATIONS OF EFTA AND REGULATION E**

76. Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), provides that "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." Section 903(1) of EFTA, 15 U.S.C. § 1693a(10), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

77. Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer."

78. Section 1005.10(b) of the Bureau of Consumer Financial Protection's Official Staff Commentary to Regulation E ("Official Staff Commentary to Regulation E"), 12 C.F.R. § 1005.10(b), Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." 12 C.F.R. § 1005.10(b), Supp. I, cmt. 5. The Official Staff Commentary to Regulation E further provides that "[t]he person that obtains the authorization must provide a copy of the terms of the authorization to the consumer either electronically or in paper form." 12 C.F.R. § 1005.10(b), Supp. I, cmt. 5 The Official Staff Commentary to Regulation E further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." 12 C.F.R. § 1005.10(b), Supp. I, cmt. 6.

79. Pursuant to Section 918(c) of EFTA, 15 U.S.C. § 1693o(c), every violation of EFTA and Regulation E constitutes a violation of the FTC Act.

**COUNT VI**
**Failure to Obtain Authorization for Recurring Bank Debits and Provide Copies of such Authorization**

80. In numerous instances, Defendants debit consumers' bank accounts on a recurring basis without (a) obtaining a written authorization signed or similarly authenticated from consumers for preauthorized electronic fund transfers from their accounts; and (b) providing consumers a copy of a written authorization signed or similarly authenticated from consumers for preauthorized electronic fund transfers from their accounts.

81. Defendants have thereby violated Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

**CONSUMER INJURY**

82. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, TILA and Regulation Z, and EFTA and Regulation E. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

83. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

84. Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), Section 108(c) of TILA, 15 U.S.C. § 1607(c), Section 918(c) of EFTA, 15 U.S.C. § 1693o(c), and the Court's own equitable powers, requests that the Court:

A.    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order freezing assets, immediate access, and appointment of a receiver;

B.    Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, TILA and Regulation Z, and EFTA and Regulation E by Defendants;

C.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the TSR, TILA and Regulation Z, and EFTA and Regulation E, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  May 11, 2020

*/s/ Gregory A. Ashe*
GREGORY A. ASHE
HELEN CLARK
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC  20580
Telephone: (202) 326-3719 (Ashe)
Telephone: (202) 326-2273 (Clark)
Facsimile: (202) 326-3768
Email: gashe@ftc.gov, hclark@ftc.gov

NICHOLAS A. TRUTANICH
United States Attorney
LINDSAY AGER
Assistant United States Attorney
Nevada Bar No. 11985
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787
Email: Lindsay.ager@usdoj.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION