# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Federal Trade Commission,

    Plaintiff

v.

Lead Express, Inc., et al.,

    Defendants

Case No.: 2:20-cv-00840-JAD-NJK

**Filed Under Seal**

**Order Granting in Part Ex Parte Emergency Motion for Temporary Restraining Order and Requiring Defendants to Show Cause**

[ECF No. 3]

    The Federal Trade Commission (FTC) sues a host of individuals and entities for a permanent injunction and other equitable relief under 15 U.S.C. §§ 53(b), 57b, 6105(b), 1607(c), and 1693o(c), alleging that they operate a massive payday-lending scheme that baits consumers with telemarketed loans that have a fixed number of principal-plus-interest payments but switches to unlimited finance-fee-only payments after the consumer agrees.[1]  The FTC moves on an ex parte and emergency basis for an order temporarily restraining defendants from engaging in the scheme, destroying records of the scheme's operations, or dissipating assets.[2]  It also seeks an order requiring the defendants to show cause why the temporary restraining order—if one is entered—should not be converted into a preliminary injunction.  Finally, the FTC seeks an order appointing a receiver, authorizing limited discovery into the location and identity of defendants' documents and assets, and authorizing the FTC to immediately access defendants' businesses.

---

[1] ECF No. 1 (complaint).  The FTC's claims arise under the Federal Trade Commission Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the Truth in Lending Act, the Electronic Fund Transfer Act, and the rules and regulations that have been promulgated to implement those Acts.

[2] ECF No. 3 (emergency motion).

1    For the reasons set forth below, I grant in part the motion for a temporary restraining

2 order; I order the defendants to show cause why (1) the restraining order should not be converted

3 into a preliminary injunction (2) a receiver should not be appointed, (3) foreign assets should not

4 be repatriated, and (4) the FTC should not be allowed expedited discovery and access to the

5 defendants' businesses; and I set those matters for hearing on June 2, 2020, at 3:00 p.m.

6                                                 **Discussion**

7 **A.      Standard to obtain temporary restraining order without notice**

8    The FTC moves for a temporary restraining order without notice under the second

9 proviso of 15 U.S.C. § 53(b) and Rule 65(b) of the Federal Rules of Civil Procedure.[3]  The

10 second proviso of § 53(b) "allows the FTC to seek injunctive relief without initiating

11 administrative action and states: '*Provided further*, That in proper cases the Commission may

12 seek, and after proper proof, the court may issue, a permanent injunction.'"[4]  The Ninth Circuit

13 has interpreted this language as authorizing a district court "to grant whatever preliminary

14 injunctions are justified by the usual equitable standards and are sought in accordance with

15 [FRCP] 65(a)."[5]  Section 53(b) relaxes the FTC's burden when seeking an injunction or a

16 restraining order by eliminating the irreparable harm requirement, but it demands that notice be

17 given to the defendant before a court can grant either form of relief.[6]  Thus, § 53(b) does not

18 support the FTC's request for a temporary restraining order without notice.

19

20 [3] *Id.* at 42–43 & n.14 (15 U.S.C. § 53(b)), 55–56 (Rule 65(b)).

21 [4] *F.T.C. v. Consumer Defense, LLC*, 926 F.3d 1208, 1212 (9th Cir. 2019) (quoting 15 U.S.C. § 53(b)).

22 [5] *Id.* (quoting *F.T.C. v. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982)).

23 [6] 15 U.S.C. § 53(b) ("Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . . .").  The Ninth Circuit recently confirmed that its "precedent

2

Rule 65 does authorize a district court to "issue a temporary restraining order without written or oral notice to the adverse party or its attorney[,]" but only if two conditions are met.[7] First, specific facts that "clearly show that immediate and irreparable, loss, or damage will result to the movant before the adverse party can be heard in opposition" must be established by affidavit or verified complaint.[8]  Second, "the movant's attorney" must certify "in writing any efforts made to give notice and the reasons why it should not be required."[9]

The FTC has not provided any authority to show that it can cobble a hybrid standard from § 53(b) and Rule 65(b) that allows the court to grant an ex parte restraining order without the FTC showing that immediate and irreparable harm will result without that relief.  So, the FTC can either give notice to the defendants and proceed with its motion for a restraining order under § 53(b) or it can meet Rule 65's demanding burdens for a restraining order without notice. Because the FTC seeks secrecy until it obtains and serves a restraining order on the defendants[10] and has provided the court with thousands of pages of evidence, I construe its motion as seeking the latter and proceed to determine if the FTC has met the standard for that relief.

### 1.  Imminent irreparable harm

The Supreme Court has instructed that ex parte "temporary restraining orders are no doubt necessary in certain circumstances, but under federal law they should be restricted to

---

eliminating the requirement of a showing of irreparable harm in cases of statutory enforcement, where an injunction is authorized by the applicable statute," which "pre-dates the Supreme Court's" decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 76 (2008), "remains intact."  *Consumer Defense, LLC*, 926 F.3d at 1213–14.

[7] Fed. R. Civ. P. 65(b)(1).

[8] *Id.* at 65(b)(1)(A).

[9] *Id.* at 65(b)(1)(B).

[10] *See* ECF No. 2 (motion to seal).

serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."[11]  "In cases where notice could have been given to the adverse party, courts have recognized 'a very narrow band of cases in which ex parte orders are proper because notice to the defendant would render fruitless the further prosecution of the action.'"[12]  To meet this standard, the plaintiff "'must show that defendants would have disregarded a direct order and disposed of [evidence] within the time it would take for a hearing'" by providing evidence that the adverse party has "a history of disposing of evidence or violating court orders or that persons similar to the adverse party have such a history.'"[13]

The FTC argues for the latter standard and relies on the declaration of Gregory Ashe to support its position.[14]  Ashe is one of the attorneys representing the FTC in this case.[15]  He declares that it is the FTC's experience that "defendants who have engaged in deceptive schemes and who receive notice of the filing of an action by the FTC or of the FTC's intent to file an action alleging consumer deception, often attempt to undermine the FTC's efforts by dissipating or concealing assets . . . ."[16]  Ashe backs up that statement by summarizing the details of 26 lawsuits ranging in file date from 1985 to 2016 in which defendants, upon learning that the FTC was acting against them or had already been granted a restraining order, proceeded to dissipate

---

[11] *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 439 (1974).

[12] *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (quoting *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 322 (7th Cir. 1979)).

[13] *Id.* (quoting *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650–51 (6th Cir. 1993)).

[14] ECF No. 5 (declaration of Gregory Ashe).

[15] *Id.* at ¶ 1.

[16] *Id.* at ¶ 9.

their assets.[17]  Ashe's summaries of these cases show that the FTC was able to recover assets when the TRO was combined with or followed by an asset freeze or with the help of a court-appointed receiver.[18]  Ashe also details eight cases in which defendants, after learning that the FTC was acting against them or had obtained a restraining order, destroyed evidence like business records.[19]  Ashe's declaration demonstrates that persons similar to the defendants here—those accused of operating a scheme to defraud consumers—have a history of dissipating their assets and destroying evidence when they receive notice that the FTC is acting against them.

The FTC also provides evidence about the defendants' past behavior to show how they might behave once noticed of this lawsuit.  Much of this evidence is provided through the declarations of Rufus Jenkins, who is employed by the FTC as an investigator in the Bureau of Consumer Protection's Division of Financial Practices.[20]  Jenkins states that he is a Certified Public Accountant and Certified Fraud Examiner.[21]  He explains that his duties include serving as the document custodian for the FTC in its investigation of the defendants' operation.[22]

It can be discerned from the evidence and Jenkins's summary that the defendants are engaged in a common enterprise to provide payday loans to consumers but omit or misstate the repayment terms and interest percentages that defendants ultimately impose on consumers.  As the FTC summarizes in its proposed order, in many instances and in connection with the

---

[17] *Id.* at ¶ 9(a)–(z).

[18] *Id.*

[19] *Id.* at ¶ 10(a)–(h).

[20] ECF No. 3-6 at ¶ 1.

[21] *Id.* at ¶¶ 4–5.

[22] *Id.* at ¶ 9.

extension of credit to consumers, defendants have claimed that consumers will repay their loan obligations with a specific amount using a fixed number of payments when, in reality, defendants typically make repeated finance-charge-only withdrawals from consumers' bank accounts without ever crediting any portion of the withdrawals to the consumers' principal balances. Consumers largely end up paying significantly more than what defendants represented they would pay. Defendants also fail to make required credit disclosures to numerous consumers. When processing many loan payments, defendants have engaged in electronic fund transfers from consumers' bank accounts without obtaining proper authorization. Finally, defendants have unlawfully used remotely created checks to process payments for loans that they offered to consumers through telemarketing.

Jenkins describes the non-public side of the alleged scheme in detail.[23] To flesh out the scheme's public side, the FTC provides declarations, statements, and complaints to the FTC's Consumer Sentinel Network and the Better Business Bureau from hundreds of consumers.[24] The FTC's documentary evidence shows that the two individual defendants, Takehisa Naito and Keishi Ikeda, are associated with all eight of the interrelated corporate defendants in a leadership or control capacity, i.e., owner, director, officer, registered agent, authorized signatory.[25] They also show that Ikeda is an authorized user or representative under cash-management agreements with the tribal defendant, La Posta Tribal Lending Enterprise.[26] The evidence shows that

---

[23] *See generally* ECF No. 3-6.

[24] *See, e.g.*, ECF Nos. 3-4–3-5 (declarations from 15 alleged victims of defendants' scheme).

[25] *See, e.g.*, ECF No. 3-6 at ¶¶ 14–15 and Tables 2 and 3. The eight corporate defendants, which are Nevada and California entities, are: Lead Express, Inc.; Camel Coins, Inc.; Sea Mirror, Inc.; Naito Corp.; Kotobuki Marketing, Inc.; Ebisu Marketing, Corp.; Hotei Marketing, Inc.; and Daikoku Marketing, Inc.

[26] *See, e.g.*, *id.* at ¶ 15 and Table 3.

defendants take great care to mask the true location of their operations and even phone numbers.[27]  The evidence also shows that defendants comingle their funds "for no apparent business reason"[28] and have dissipated assets to accounts owned or controlled by Naito in Japan, used company assets for personal expenses like medical bills and country club dues, and that Naito and Ikeda have withdrawn copious amounts of cash from the corporate defendants' bank accounts.[29]

It can be reasonably inferred from the FTC's evidence that, were defendants provided notice and an opportunity to be heard, they would dissipate, move, hide, and conceal their assets and business records before the court could enter an order.  Thus, I find that the evidence clearly shows that immediate and irreparable injury, loss, or damage will result if the defendants are allowed to be heard in opposition on the motion for a temporary restraining order.

### 2.    *Explanation for why notice should not be required*

Counsel for the FTC declares that the defendants have not received—and should not receive—notice because defendants in similar circumstances have a habit of ignoring court orders, concealing their identities and assets, and destroying evidence.[30]  Counsel infers from defendants' past behavior of transferring funds, including to foreign accounts, with no legitimate business purpose and attempts to conceal their identities that, if notified, they will dissipate or conceal their assets and destroy or conceal evidence of their conduct.[31]  Counsel declares that

---

[27] *See, e.g.*, *id.* at ¶¶ 28–29 and Table 5.

[28] *Id.* at ¶ 74.

[29] *Id.* at ¶¶ 75–79.

[30] ECF No. 5.

[31] *Id.* at ¶ 8.

1  this is especially so if the defendants learn that the FTC is seeking monetary relief from them.  I

2  find that counsel has adequately explained why notice should not be required in this case.

3  **B.      The standard for a restraining order and preliminary injunction**

4          The legal standard for issuing a temporary restraining order is "substantially identical" to

5  the standard for issuing a preliminary injunction.[32]  The Supreme Court clarified the standard for

6  these forms of equitable relief in *Winter v. Natural Resources Defense Council, Inc.*, instructing

7  that the plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to

8  suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in

9  [its] favor, and that an injunction is in the public interest."[33]

10         Irreparable harm will be presumed for the purposes of the FTC's request to convert the

11 restraining order into a preliminary injunction, which the court will hear oral argument on early

12 next month.[34]  It is not presumed for the purposes of the FTC's request for a temporary

13 restraining order without notice but, as I explained above, I find that the FTC has shown that it,

14 and the class of persons it seeks to protect, will suffer irreparable harm if the defendants are not

15 temporarily restrained from engaging in this allegedly fraudulent behavior and their assets

16 frozen, so I will consider the three remaining *Winter* factors.

17 . . .

18 . . .

19

20 ----

[32] *See Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839 n.7
21 (9th Cir. 2001) (stating that the "analysis is substantially identical for the injunction and the TRO").

22 [33] *Winter*, 555 U.S. at 20; *accord Herb Reed Enterprises, LLC v. Fla Entertainment Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013)).

23 [34] *See* 15 U.S.C. § 53(b).  Provided that the FTC gives defendants the requisite notice of its motion and this order.

8

*1.* *Likelihood of success on the merits*

The FTC asserts the following claims:

- A claim under 15 U.S.C. § 45(a) of the Federal Trade Commission Act for misrepresenting the repayment terms of the payday loans that defendants market and offer to consumers.[35]

- A claim under 16 C.F.R. § 310.3(a)(2)(iii) of the FTC prescribed Telemarketing Sales Rule (TSR) for misrepresenting the repayment terms of the payday loans that defendants market and offer to consumers.[36]

- A claim under 16 C.F.R. § 310.4(a)(9) of the TSR for using remotely created checks in connection with the payday loans that defendants market and offer to consumers.[37]

- A claim under 15 U.S.C. §§ 1631, 1638 of the Truth in Lending Act (TILA) and 12 C.F.R. §§ 1026.17 and 1026.18 of the TILA's implementing Regulation Z for failing to make required disclosures for the payday loans that defendants market and offer to consumers.[38]

---

[35] ECF No. 1 at ¶¶ 48–52 (Count 1).

[36] *Id.* at ¶¶ 53–60 (Count 2).

[37] *Id.* at ¶¶ 53–58, 61–62 (Count 3).

[38] *Id.* at ¶¶ 63–73 (Count 4).

- A claim under 15 U.S.C. § 1664 of the TILA and 12 C.F.R. § 1026.24(d) of Regulation Z for failing to make required disclosures in advertisements for the loans and extensions of credit that defendants market and offer to consumers.[39]

- A claim under 15 U.S.C. § 1693e(a) of the Electronic Fund Transfer Act (EFTA) and 12 C.F.R. § 1005.10(b) of the EFTA's implementing Regulation E for failing to obtain consumers' authorization for recurring bank debits that defendants cause to be made or failing to provide consumers with copies of their authorizations.

Based on the FTC's evidence, there is good cause to believe that the defendants have engaged in or are likely to engage in acts or practices that violate these statutes, rules, and regulations. Based on this record, I find that the FTC has shown that it is likely to succeed on the merits of its claims.

### 2.      *Balance of the equities*

This factor requires me to balance the potential harm to the plaintiff in the absence of a temporary restraining order with the potential harm to the defendants if such an order is granted. The FTC seeks to restrain defendants from committing several categories of acts, so I address the relative harms with each category.

The FTC seeks to restrain defendants from engaging in eight categories of conduct associated with extending credit, offering loans, and telemarketing: (1) misrepresenting or assisting others in misrepresenting that (a) any person will withdraw a fixed number of payments from consumers' bank accounts to repay consumers' loans, (b) any person will withdraw a fixed total of payments from consumers' bank accounts to repay consumers' loans, (c) any person will withdraw from consumers' bank accounts payments that consist of both interest and principal

---

[39] *Id.* at ¶¶ 63–71, 74–75 (Count 5).

repayment, and (d) any other fact material to consumers about any loan or other extension of credit; (2) failing to disclose clearly and conspicuously all material terms of an automatic renewal or refinance provision in any loan or extension of credit; (3) creating or causing to be created a remotely created payment order, including checks, as payment for any good or service offered or sold through telemarketing; (4) failing to disclose clearly and conspicuously in a written form that consumers may keep before extending credit, information reflecting the terms of the legal obligations between the parties, including (a) the amount financed, (b) the finance charge, (c) the annual percentage rate, (d) the payment schedule, and (e) the total number of payments; (5) failing to obtain written authorization signed or similarly authenticated from a consumer before debiting that consumer's bank account on a recurring basis; (6) failing to provide a copy of a written authorization signed or similarly authenticated from a consumer before debiting that consumer's bank account on a recurring basis; (7) disposing or transferring in any manner the personal identification or financial information of any person that defendants obtained in connection with the conduct that is at issue in this action; and (8) benefitting from or using in any manner the personal identification or financial information of any person that defendants obtained in connection with the conduct that is at issue in this action.  These acts constitute violations of the Trade Commission Act, the TSR, the TILA and its implementing Regulation Z, and the EFTA and its implementing Regulation E or are in furtherance of violating those federal laws.  No harm will befall the defendants if they are enjoined from engaging in any of these acts.  But the public will be harmed if, in the absence of a restraining order, defendants continue to commit acts of or in furtherance of telemarketing and lending statutory violations. The harms to consumers include the loss of money with little chance of recovery; false feelings of hope that they obtained much needed financial relief; false feelings of urgency to claim the

promised loans; and feelings of anger, embarrassment, or distress when more money is withdrawn from their bank accounts than what was agreed to.  The harms to the United States and the FTC include any distrust or anger those citizens feel toward the FTC or the United States as a result of being defrauded in heavily regulated industries, i.e., lending and telemarketing.

The FTC also seeks to restrain the defendants from destroying, deleting, removing, or transferring any and all business, financial, accounting, and other records concerning their operations and the operations of any other entity that is owned or controlled in whole or in part by any defendant.  The only harm I perceive that could befall the defendants if they are so enjoined is having to pay to maintain these records and any copies.  This is a minimal harm, and I anticipate that the defendants are already required to maintain many of these records for several years under federal or state law.  The harm to the FTC, the United States, and consumers is loss of documentation necessary for restitution or recovery, which outweighs the defendants' potential harm.

Finally, the FTC seeks to freeze the defendants' assets, to prohibit them from opening any safe deposit boxes or commercial mailboxes, and to prohibit them from cashing or depositing any money they receive from their consumers, clients, or customers.  I perceive that the FTC and the public will be harmed if, in the absence of a restraining order, defendants continue to commit acts of or in furtherance of this alleged telemarketing, lending, and credit-extension scheme.  The harms to the public who are consumers of defendants' loan and credit offerings include the loss of money with little chance of recovery, false feelings of hope that they obtained much needed financial relief; false feelings of urgency to claim the promised loans; and feelings of anger, embarrassment, or distress when more money is withdrawn from their bank accounts than what was agreed to.  The harms to the United States and the FTC include any

distrust or anger those citizens feel toward the FTC or the United States as a result of being

defrauded in heavily regulated industries, i.e., lending and telemarketing.

The only harms I foresee to the individual defendants if they are so enjoined is that they

might be unable to pay for ordinary living expenses like food, shelter, transportation, and

insurance premiums.  But I have no evidence of what either Naito or Ikeda needs for legitimate

living expenses, and the harm is lessened by the FTC's suggested carve out that the asset freeze

not prohibit the individual defendants from incurring charges on any personal credit cards that

were established before this order was entered, up to the pre-existing limits.  The harms that

could befall the corporate and trial defendants if they are so enjoined is that they might be unable

to pay for ordinary operating expenses like rent, utilities, insurance premiums, and payroll.

These are not insignificant harms, but with an expedited hearing and briefing schedule for the

FTC's motion for a preliminary injunction—where defendants can present evidence of their

needs—the harms to the FTC and the public outweigh the harms to the defendants.

### 3. *Public interest*

The final *Winter* factor requires me to determine whether the requested temporary

restraining order would advance or impair the public's interest.  The purpose of the requested

order is to prevent future harm to the public by denying the defendants' ability to use misleading

practices to aid in an allegedly fraudulent scheme.  The public has a strong interest in protecting

the banking and telecommunication systems from being used by schemers and fraudsters.  I find

that a narrowly tailored temporary restraining order would advance that public interest.  So, I

conclude that this factor is also met.

. . .

. . .

13

**C.      Standard for appointing a receiver**

Under the local rules of this court, a "temporary receiver may be appointed without notice upon adequate showing provided by [FRCP] 65."[40]  I can reasonably infer from the FTC's evidence that, if defendants are allowed to be heard in opposition on the motion for a temporary restraining order, they would dissipate their assets and destroy their business and financial records before the court could enter an order on that motion.  I cannot, however, reasonably infer from the same evidence that defendants would do so in violation of a court order.  The FTC has not offered evidence that any defendant has a history of violating court orders.  For this reason, I conclude that this record does not justify appointing a receiver over the defendants' business operations on an ex parte basis.  I therefore deny the FTC's request to appoint a receiver on an ex parte and temporary basis.  I also deny its remaining requests for further equitable relief on an ex parte and temporary basis.  I will consider all of those requests in conjunction with the FTC's request for injunctive relief.

**Conclusion**

IT IS THEREFORE ORDERED that the FTC's Emergency Ex Parte Motion for Temporary Restraining Order with Asset Freeze, Appointment of Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue **[ECF No. 3] is GRANTED in part**.  The defendants Lead Express, Inc.; Camel Coins, Inc.; Sea Mirror, Inc.; Naito Corp.; Kotobuki Marketing, Inc.; Ebisu Marketing, Corp.; Hotei Marketing, Inc.; Daikoku Marketing, Inc.; La Posta Tribal Lending Enterprise; Takehisa Naito; and Keishi Ikeda and their officers, agents, servants, employees, attorneys, and all other persons or entities in active concert

---

[40] L.R. 66-2.

or participation with any of them, who receive actual notice of this order by personal service or otherwise, are temporarily restrained from:

1.     Engaging in the following **prohibited business activities** in connection with the advertising, marketing, promoting, or offering of any loan or other extension of credit:

    A.     Misrepresenting or assisting others in misrepresenting, expressly or by implication:

        1.     That any person will withdraw from consumers' bank accounts a fixed number of payments to repay consumers' loans;

        2.     That any person will withdraw from consumers' bank accounts a fixed total of payments to repay consumers' loans;

        3.     That any person will withdraw from consumers' bank accounts payments that consist of both interest and principal repayment; and

        4.     Any other fact material to consumers concerning any loan or other extension of credit, including, but not limited to: (a) closing costs or other fees and how such costs or fees will be assessed, (b) the payment schedule, monthly payment amount(s), any balloon payment, or other payment terms, (c) the interest rate(s), annual percentage rate(s), or finance charge(s), and whether they are fixed or adjustable, (d) the loan amount, credit amount, draw amount, or outstanding balance, (e) the loan term, draw period, or maturity, (f) the amount of cash to be disbursed to the borrower out of the proceeds, or the amount of cash to be disbursed on behalf of the borrower to any third parties, (g) whether any specified minimum payment amount covers both interest and principal, and whether

the credit has or can result in negative amortization, and (h) that the credit does not have a prepayment penalty or whether subsequent refinancing may trigger a prepayment penalty and/or other fees;

B.      If a loan or extension of credit contains an automatic renewal or refinance provision, failing to disclose clearly and conspicuously all material terms and conditions of that provision, including, but not limited to (1) the fact that loan or extension of credit will automatically renew or refinance unless the borrower takes an affirmative action to avoid such renewal or refinance, (2) the date the loan or extension of credit will renew or refinance, and (3) the specific steps the borrower must take to avoid renewal or refinance;

C.      Creating or causing to be created, directly or indirectly, a remotely created payment order, including a remotely created check, as payment for any good or service offered or sold through telemarketing;

D.      Failing to disclose clearly and conspicuously in writing, in a form consumers may keep, before extending credit, the following information in a manner reflecting the terms of the legal obligations between the parties: (1) the amount financed, (2) the finance charge, (3) the annual percentage rate, (4) the payment schedule, and (5) the total of payments;

E.      Failing to provide a copy of a written authorization signed or similarly authenticated from any Person before debiting such Person's bank account on a recurring basis;

. . .

. . .

2.      Releasing or using **customer information** by:

     A.      Selling, renting, leasing, transferring, or otherwise disclosing, the name, address, birth date, telephone number, email address, credit card number, bank account number, Social Security number, or other financial or identifying information of any person that any defendant obtained in connection with any activity that pertains to the subject matter of this order; or

     B.      Benefitting from or using customer information by the name, address, birth date, telephone number, email address, credit card number, bank account number, Social Security number, or other financial or identifying information of any person that any defendant obtained in connection with any activity that pertains to the subject matter of this order;

     C.      Provided, however, that defendants may disclose such identifying information to a law enforcement agency, to their attorneys as required for their defense, as required by any law, regulation, or court order, or in any filings, pleadings or discovery in this action in the manner required by the Federal Rules of Civil Procedure and by any protective order in the case; and

3.      **Destroying**, erasing, falsifying, writing over, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly,

**documents**[41] that relate to: (1) the business, business practices, assets,[42] or business or personal finances of any defendant; (2) the business practices or finances of entities directly or indirectly under the control of any defendant; or (3) the business practices or finances of entities directly or indirectly under common control with any other defendant.

IT IS FURTHER ORDERED that the **defendants' assets are FROZEN pending the show-cause hearing or further court order**.  What this means is that:

1.    Defendants and their officers, agents, employees, and attorneys and all other persons or entities in active concert or participation with any of them, who receive actual notice of this order by personal service or otherwise, are temporarily restrained from:

      A.    Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, relinquishing, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any assets that are:

            1.    Owned or controlled, directly or indirectly, by any defendant;

            2.    Held, in part or in whole, for the benefit of any defendant;

---

[41] As used in this order, "document" is synonymous in meaning and equal in scope to the usage of "document" and "electronically stored information" in FRCP 34(a) and includes writings, drawings, graphs, charts, photographs, sound and video recordings, images, Internet sites, web pages, websites, electronic correspondence, including e-mail and instant messages, contracts, accounting data, advertisements, FTP Logs, Server Access Logs, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, computer records, customer or sales databases and any other electronically stored information, including documents located on remote servers or cloud computing systems, and other data or data compilations from which information can be obtained directly or, if necessary, after translation into a reasonably usable form.  A draft or non-identical copy is a separate document within the meaning of the term.

[42] As used in this order, "asset" means any legal or equitable interests in, right to, or claim to, any property, wherever located and by whomever held.

3.     In the actual or constructive possession of any defendant; or

4.     Owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any defendant;

B.     Opening or causing to be opened any safe deposit boxes, commercial mailboxes, or storage facilities titled in the name of any defendant or subject to access by any defendant.

C.     Incurring charges or cash advances on any credit, debit, or ATM card issued in the name, individually or jointly, of any corporate defendant[43] or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any defendant or of which any defendant is an officer, director, member, or manager.  This includes any corporate bankcard or corporate credit card account for which any defendant is, or was on the date that this order is entered, an authorized signor; or

D.     Cashing any checks or depositing any money orders or cash received from consumers, clients, or customers of any defendant;

E.     The assets affected by this order include: (1) all assets of defendants as of the time this order is entered; and (2) assets obtained by defendants after this

---

[43] As used in this order, "corporate defendant" means Lead Express, Inc.; Camel Coins, Inc.; Sea Mirror, Inc.; Naito Corp.; Kotobuki Marketing, Inc.; Ebisu Marketing, Inc.; Hotei Marketing, Inc.; Daikoku Marketing, Inc.; La Posta Tribal Lending Enterprise; and each of their subsidiaries, affiliates, successors, and assigns.

order is entered if those assets are derived from any activity that is the subject of the Complaint in this matter or that is prohibited by this order.

2.      Any financial or brokerage institution, electronic data host,[44] credit card processor, payment processor, merchant bank, acquiring bank, independent sales organization, third party processor, payment gateway, insurance company, business entity, or person who receives actual notice of this order (by service or otherwise) that (a) has held, controlled, or maintained custody, through an account or otherwise, of any document on behalf of any defendant or any asset that has been owned or controlled, directly or indirectly, by any defendant; held, in part or in whole, for the benefit of any defendant; in the actual or constructive possession of any defendant; or owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any defendant; (b) has held, controlled, or maintained custody, through an account or otherwise, of any document or asset associated with credits, debits, or charges made on behalf of any defendant, including reserve funds held by payment processors, credit-card processors, merchant banks, acquiring banks, independent sales organizations, third-party processors, payment gateways, insurance companies, or other entities; or (c) has extended credit to any defendant, including through a credit-card account, must:

---

[44] As used in this order, "electronic data host" means any person or entity in the business of storing, hosting, or otherwise maintaining electronically stored information.  This includes, but is not limited to, any entity hosting a website or server, and any entity providing cloud-based electronic storage.

A.      Hold, preserve, and retain within its control and prohibit the withdrawal, removal, alteration, assignment, transfer, pledge, encumbrance, disbursement, dissipation, relinquishment, conversion, sale, or other disposal of any such document or asset, as well as all documents or other property related to such assets, except by further order of this court; **provided**, **however**, that this provision does not prohibit either Takehisa Naito or Keishi Ikeda from incurring charges on any personal credit card established prior to entry of this order, up to the pre-existing credit limit; and

B.      Deny any person or entity access to any safe deposit box, commercial mail box, or storage facility that is titled in the name of any defendant, either individually or jointly, or otherwise subject to access by any defendant.

IT IS FURTHER ORDERED that defendants must immediately provide a copy of this order to each affiliate, telemarketer, marketer, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, attorney, spouse, subsidiary, division, and representative of any defendant, and defendants shall not take any action that would encourage officers, agents, members, directors, employees, salespersons, independent contractors, attorneys, subsidiaries, affiliates, successors, assigns or other persons or entities in active concert or participation with them to disregard this order or believe that they are not bound by its provisions.

IT IS FURTHER ORDERED that the FTC is directed to serve the defendants with summonses, copies of the complaint, and copies of the emergency motion and exhibits and this order as soon as practicably possible.  The FTC must comply with FRCP 4 when serving the defendants with summonses and copies of the complaint but it may serve the emergency motion

and exhibits and this order on defendants by any means that it believes will provide reasonable and quick notice, including facsimile, email, or personal overnight delivery.

IT IS FURTHER ORDERED that the FTC is not required to post a bond for security for the issuance of this temporary restraining order.[45]

IT IS FURTHER ORDERED that the defendants must **SHOW CAUSE** in writing by **May 25, 2020**, why (1) this temporary restraining order should not be converted into a preliminary injunction; (2) a receiver should not be appointed over the corporate defendants with the duties and authority set forth by the FTC in its emergency motion and proposed order, (3) foreign assets should not be repatriated, and (4) the FTC should not be allowed expedited discovery and access to the defendants' businesses.  The FTC has until **May 29, 2020**, to file a reply to any response to this show-cause order.

IT IS FURTHER ORDERED that the matters at issue in the show-cause order, including the FTC's request for a preliminary injunction, **will be heard via videoconferencing (with no in-person appearances) at 3:00 p.m. on June 2, 2020**.  Details for connecting to that hearing will be distributed in a future order.

The Clerk of Court is directed to send an electronic copy of this order to the FTC's attorneys at their listed email addresses.

_____
U.S. District Judge Jennifer A. Dorsey
May 19, 2020

---

[45] *See* Fed. R. Civ. P. 65(c).