**EXHIBIT INDEX**

| Exhibit | | Page |
|---|---|---|
| A | Preliminary Report of Receiver | 1 |

# EXHIBIT A

Preliminary Report of Receiver

EXHIBIT A

*Federal Trade Commission v. Lead Express, Inc., et al.*
U.S. District Court (D. Nev.) Case No. 2:20-cv-00840-JAD-NJK

**PRELIMINARY REPORT OF RECEIVER**

Thomas W. McNamara
Regulatory Resolutions
655 West Broadway, Suite 1680
San Diego, California 92101
Telephone:   619-269-0400
Facsimile:    619-269-0401
*Receiver*

# TABLE OF CONTENTS

I. Introduction ..................................................................................................................... 1
II. Implementation of Preliminary Injunction .................................................................... 1
    A.    Receivership Entities Business Location ............................................................. 1
    B.    Financial Accounts of Receivership Entities ....................................................... 3
    C.    Cooperation and Interviews .................................................................................. 5
    D.    Documents/Information/Electronic Data .............................................................. 5
    E.    Forensic Accountant ............................................................................................. 7
    F.    Compliance with PI .............................................................................................. 7
III. Summary of Business Operations ................................................................................. 7
    A.    Sales Process ........................................................................................................ 8
    B.    Common Enterprise .............................................................................................. 8
IV. Records Found at Las Vegas Site ................................................................................. 9
    A.    Misrepresentations and TILA Violations ............................................................. 9
    B.    Sales Incentives .................................................................................................. 10
    C.    Complaints ......................................................................................................... 11
V. Financial ....................................................................................................................... 11
VI. Can the Business be Conducted Profitably and Lawfully? ........................................ 12

# PRELIMINARY REPORT OF RECEIVER

## I.

## Introduction

The undersigned, Thomas W. McNamara, was appointed Receiver of the Receivership Entities[1] ("Receiver") by the stipulated Preliminary Injunction Against the Corporate Defendants entered June 19, 2020 (ECF No. 44, "PI").

I submit this Preliminary Report in compliance with the PI's directive (Section XX) that I report periodically to the Court on five specified topics: (1) steps taken to implement the PI; (2)-(3) the value of all liquidated and unliquidated assets and the sum of all liabilities of Receivership Entities; (4) future steps to prevent any diminution in the value of assets, pursue assets from third parties, and adjust liabilities of Receivership Entities; and (5) assessment of whether the business can be operated lawfully and profitably. All of these matters are addressed below.

## II.

## Implementation of Preliminary Injunction

### A. Receivership Entities Business Location

As directed by Section XII.H of the PI, we secured the one location from which Receivership Entities have any business operations – 101 Convention Center Drive, Suite 500, Las Vegas, Nevada – beginning on Friday, June 19, 2020. On Friday night, the locks to the premises were changed and the building janitorial staff conducted a COVID-19 deep clean and disinfectant process. Our computer forensic team entered late Saturday night to begin the forensic imaging of selected computers. The full receivership team was in place by Monday morning, June 22.

///

---

[1] Receivership Entities are defined in the PI (Definition K, page 5) as the Corporate Defendants (Lead Express, Inc., Camel Coins, Inc., Sea Mirror, Inc., Naito Corp., Kotobuki Marketing, Inc., Ebisu Marketing, Inc., Hotei Marketing, Inc., and Daikoku Marketing, Inc., and each of their subsidiaries, affiliates, successors, and assigns ) "as well as and any other entity that has conducted any business related to lending services, including receipt of Assets from any activity that is the subject of the Complaint in this matter, and that the Receiver determines to be controlled or owned by any Corporate Defendant or Individual Defendant."

1

We found no active business onsite, just the remnants of a payday loan business down-sized by the COVID-19 pandemic and then shuttered by the Temporary Restraining Order entered May 19, 2020 (ECF No. 13, "TRO").  Defendants' counsel later confirmed Defendants shut down the business after entry of the TRO.

The overall premises are expansive (approximately 11,000 square feet, leased at $17,000 per month),[2] but operations had clearly been recently downsized.  Timecard records onsite indicated that approximately 25 employees were active leading up to May 19, 2020.  A whiteboard in the office of Individual Defendant Takehisa Naito ("Naito") listed downsizing agenda items, including options for smaller space in the same building, possible cancellation of the phone system lease, and health insurance and payroll issues.  We found a junk removal company's quote to dispose of materials requiring 5-6 trucks, but that order was never placed.  Defendants had attempted to sell some furniture, but when that failed, they gave it to the building which has stored it in a nearby suite.

We identified approximately 30 workstations equipped with desks, telephones and computer equipment:  one corner office for Naito; two executive desks for Individual Defendant Keishi Ikeda just outside the corner office; one executive desk for Chan Joo Chung, the onsite General Manager; and approximately 25 desks for sales personnel.

In its current configuration, the premises are sparse – nearly 50% of the space is empty where desks/workstations were once in place.  The west end of the office is a graveyard of disconnected and discarded equipment stacked up on the floor or lined up on tables – approximately 200 desktop computers and their related monitors, keyboards and cables; and approximately 200 phone sets and related headsets and cables.

After we completed our review, we obtained the parties' consent to secure the business records of Receivership Entities and vacate the premises.  We removed all business records (as detailed in Section II.D below) and returned leased equipment (water dispensers and shred bins) to their respective vendors, except the Mitel telephone system which had been leased from two vendors.  Both vendors later decided to abandon the telephones.

---

[2] An inventory of furniture and equipment located onsite and a rough schematic of the premises are attached as Exhibit 1.

2

After determining that the furniture, computer equipment, printers, and file cabinets had no realizable value, we arranged for their removal by junk and recycling vendors. The only sellable items – two 600-pound Sentry safes in Naito's office – were sold for $900. By Thursday, July 2, 2020, we had cleared out the space. After the financing companies abandoned the leased telephones, we returned the premises to the landlord.

**B.      Financial Accounts of Receivership Entities**

The following bank and merchant accounts of Receivership Entities with positive balances have been frozen since entry of the TRO on May 19, 2020:

| Receivership Entities Account Name | Bank | Account No. | Balance Frozen |
|---|---|---|---|
| Camel Coins, Inc. | Open Bank | 0482 | $5,357.76 |
| Camel Coins, Inc. | Wells Fargo | 9898 | $49,292.21 |
| Daikoku Marketing, Inc | Wells Fargo | 6881 | $353.80 |
| Ebisu Marketing, Inc | Open Bank | 0466 | $21,979.98 |
| Ebisu Marketing, Inc | Wells Fargo | 6154 | $19,854.73 |
| Hotei Marketing, Inc. | Wells Fargo | 3413 | $408.44 |
| Kotobuki Marketing, Inc. | Open Bank | 3791 | $905,695.35 |
| Kotobuki Marketing, Inc. | Wells Fargo | 9062 | $32,331.39 |
| Lead Express, Inc. | Open Bank | 0474 | $4,582.66 |
| Lead Express, Inc. | Wells Fargo | 9880 | $37,325.38 |
| Naito Corp. | Open Bank | 0458 | $162,746.78 |
| Naito Corp. | Wells Fargo | 9539 | $134,201.86 |
| Sea Mirror, Inc. | Open Bank | 0557 | $4,002.55 |
| Sea Mirror, Inc. | Wells Fargo | 8354 | $50,002.74 |
| **Total** | | | **$1,428,135.63** |

We note that Receivership Entities obtained three Paycheck Protection Program ("PPP") loans from the U.S. Small Business Administration in the amounts of $362,400 (Kotobuki Marketing, Inc.), $59,300 (Naito, Corp.), and $15,300 (Ebisu Marketing, Corp.). The three PPP loans were funded in early May 2020. All loan proceeds were frozen by the lender when the TRO was entered on May 19, 2020. The Receiver intends to return the PPP loans to the U.S. Small Business Administration.

///

///

In addition, the following accounts of La Postal Tribal Lending Enterprise (the "Tribal Defendant")[3] have been frozen and, pursuant to Section XI of the stipulated Preliminary Injunction Against the Tribal Defendant entered June 19, 2020 (ECF No. 47), we are in the process of transferring the funds from these accounts to the receivership.

| Tribal Defendant Account Name | Bank | Account No. | Balance Frozen |
|---|---|---|---|
| La Posta Tribal Lending Enterprise | First Dakota National Bank | 9782 | $38.69 |
| La Posta Tribal Lending Enterprise | First National Bank of Albany | 8448 | $100.00 |
| La Posta Tribal Lending Enterprise dba Gentle Breeze | CNB Bank & Trust | 4144 | $21,141.97 |
| La Posta Tribal Lending Enterprise dba Gentle Breeze | First Dakota National Bank | 9322 | $1,616.46 |
| Gentle Breeze, a division of La Posta Tribal Lending Enterprise | First National Bank of Albany | 3141 | $13.16 |
| Gentle Breeze, a division of La Posta Tribal Lending Enterprise | First National Bank of Albany | 3507 | $14,614.66 |
| Gentle Breeze, a division of La Posta Tribal Lending Enterprise | First National Bank of Albany | 3568 | $23,315.45 |
| Gentle Breeze | PeopleFirst Bank | 5752 | $15,476.66 |
| La Posta Tribal Lending Enterprise d/b/a Green Stream Lending | First Dakota National Bank | 8212 | $2,046.94 |
| Green Stream, a division of La Posta Tribal Lending Enterprise | First National Bank of Albany | 3202 | $10.00 |
| Green Stream, a division of La Posta Tribal Lending Enterprise | First National Bank of Albany | 3751 | $13,763.12 |
| Green Stream, a division of La Posta Tribal Lending Enterprise | First National Bank of Albany | 3812 | $30,344.75 |
| Green Stream Lending | PeopleFirst Bank | 5736 | $16,458.76 |
| Harvest Moon Financial, a division of La Posta Tribal Lending Enterprise | First Dakota National Bank | 9232 | $1,361.01 |
| Harvest Moon Financial, a division of La Posta Tribal Lending Enterprise | First National Bank of Albany | 3263 | $56.75 |
| Harvest Moon Financial, a division of La Posta Tribal Lending Enterprise | First National Bank of Albany | 3629 | $13,638.34 |

---

[3] Consumers obtained loans from three lenders – Gentle Breeze Online ("Gentle Breeze"), Green Stream Lending ("Green Stream"), and Harvest Moon Financial ("Harvest Moon") – all of which are divisions of the Tribal Defendant.

| Tribal Defendant Account Name | Bank | Account No. | Balance Frozen |
|---|---|---|---|
| Harvest Moon Financial, a division of La Posta Tribal Lending Enterprise | First National Bank of Albany | 3690 | $34,121.06 |
| Harvest Moon Financial | PeopleFirst Bank | 5776 | $9,421.33 |
| **Total** | | | **$197,539.11** |

Multiple accounts of Individual Defendants Takehisa Naito and Keishi Ikeda have also been frozen.

### C.   Cooperation and Interviews

No employees have been onsite at the Las Vegas location at any time since we took possession.  We were able to speak briefly by telephone with one employee – Leticia Hill, a sales manager for the Harvest Moon team – who provided some information on process and procedures.[4]

Counsel for Receivership Entities have been cooperative.  They have provided background information and credentials to various computers and accounts and have secured the return of three vehicles owned by the Receivership Entities – 2015 GMC Yukon, 2016 Hyundai Tucson SE, and 2016 Mercedes-Maybach S600 – which are now secured in a Las Vegas vehicle storage facility.

### D.   Documents/Information/Electronic Data

Upon taking possession of the Las Vegas site, my team confirmed that all hard copy documents onsite were secured and that all access to computers and electronic data was terminated.

While the business had been shuttered, extensive paper records remained onsite located at multiple locations: active workstations; inactive desks and workstations that were not computer-equipped; two safes located in Naito's office; and 39 four-drawer file cabinets.  We collected the paper documents, labeled them by their original location, and shipped them (in approximately 250 bankers boxes) to the Receiver's storage facility in San Diego.

---

[4] The Receiver left voicemail messages for half-a-dozen other employees, but no return calls were received.

5

The receivership retained Hadron Computer Forensics & Investigations to forensically image the computers used by Individual Defendants and managers (19 computers in total).  All forensically imaged computers were preserved intact and placed in storage.  As to the remaining computers onsite (approximately 220), the hard drives were removed, labeled, and shipped to the same storage facility.[5]

Pursuant to Section XII.E of the PI, we obtained the assistance of the FTC's Digital Forensics Unit to preserve email accounts and email providers used by Receivership Entities, including ICDSoft, GoDaddy, Gmail, and Hotmail.

Tumbleweed Software, Inc. d/b/a Answers, Etc. ("Answers, Etc."), provided a loan management system to Receivership Defendants and has taken steps to preserve all data.  We obtained access to the loan management system, but the software is antiquated.  We asked Answers, Etc. to run certain reports, which are discussed below, and provide a copy of the data.

Receivership Entities used QuickBooks to maintain their financial information.  The accounting company, Kiyohara & Takahashi, LLP, hosted the Receivership Entities' QuickBooks and provided a copy to the Receiver.

Five9 and Convergence Communications ("Convergence") provided phone services to Receivership Entities.  Five9 confirmed that it did not store call recordings, and defense counsel reports Convergence maintains the Receivership Entities' call recordings.  However, Convergence, which filed bankruptcy two years ago and has been difficult to contact, claims it does not hold any telephone recordings.  Convergence continues, however, to send monthly invoices (approximately $2,600 per month) to Receivership Entity Kotobuki Marketing, Inc., suggesting that it might house the recordings.  We will continue our efforts to locate call recordings.

Pursuant to Section XI of the Preliminary Injunction against it, the Tribal Defendant has transferred to the Receiver six internet domains (gentlebreezeonline.com, mygbo.com, harvestmoonloans.com, hmlogin.com, gsllogin.com, and greenstreamlending.com).  The

---

[5] The hard drives were removed to protect consumer information and minimize storage costs. Since the Receivership Entities' computers were all several generations old, they had little value and were removed by the junk and recycling vendors.

6

Receiver has modified these websites to provide consumers information about the FTC's case and the receivership.

**E.  Forensic Accountant**

The Receiver's forensic accountant, Lisa Jones, was tasked to review the financial activity of Receivership Entities based on internal QuickBooks records. The results are presented in Exhibit 2.

**F.  Compliance with PI**

Given the absence of any active operations requiring suspension, the steps necessary to insure compliance with the PI have been limited to further implementation of the asset freeze initiated by the TRO and securing the Las Vegas location and all records and assets onsite there.

## III.

## Summary of Business Operations

Although operations have been shuttered since entry of the TRO on May 19, 2020, Receivership Entities had clearly operated their payday loan business from the Las Vegas location up to the May 19, 2020 entry of the TRO, albeit with reduced staff of approximately 25 individuals.

The materials onsite confirmed the basic contours of the business. Individual payday loans were generally small ($200-$500) and short-term, but the business scaled up on high volume and high finance charges (interest and fees)[6] that inflated consumer "repayments" to many multiples of the original loan. Defendants target market was typical for the industry: consumers looking for a quick loan with nominal credit review to get to the next payday.

Answers, Etc. provided the loan management system called PowerCheck. Each loan portfolio for the three lenders has its own database. For the period April 2011 to May 2020,

---

[6] Even the fully-disclosed and transparent costs of the loans were tremendous. For example, on a $200 loan, the Consumer Loan Agreement listed interest at 1,860.89% APR with $90 service fee and $1.77 interest. After the loan was issued, Gentle Breeze debited fees every two weeks from January 16, 2020 to May 7, 2020, withdrawing $833.85 from the consumer. *See* Exhibit 3. In another example, a $200 loan was issued on April 25, 2019 (1,209.19% APR, $90 service fee, and $2.76 interest). From May 8, 2019 to July 17, 2019, Harvest Moon debited fees every two weeks, totaling $556.56. *See* Exhibit 4. After the consumer complained to BBB, Harvest Moon stopped charging and agreed to issue a refund in the amount of $259.56. *See* Exhibit 5.

Gentle Breeze funded 160,054 loans totaling $36,125,796.50.  For the period April 2013 to May 2020, Green Stream funded 48,160 loans totaling $8,951,203.  For the period January 2013 to May 2020, Harvest Moon funded 77,487 loans totaling $14,585,349.

Payments from Gentle Breeze consumers totaled approximately $101.7 million ($15.6 million in principal, $81.7 million in fees, and $4.4 million in interest).  Payments from Green Stream consumers totaled approximately $28.7 million ($4.2 million in principal, $23.6 million in fees, and $1 million in interest).  Payments from Harvest Moon consumers totaled approximately $44.9 million ($6.3 million in principal, $36.9 million in fees, and $1.7 million in interest).

### A.  Sales Process

The sales process reflected in the materials onsite was a familiar one:  consumers were driven to lender websites by "lead generation" techniques; consumers provided necessary personal and banking information during intake; the underwriting and approval process was elemental and swift; and approved consumers were directed to electronically sign a form Consumer Loan Agreement.

Defendants conducted this sales process through a labyrinth with many moving parts.  Three different "lenders" were presented to consumers (Harvest Moon, Green Stream, and Gentle Breeze), each a dba of the Tribal Defendant, and each with its own website and sales team managed by Receivership Entities and organized in three pods (one pod for each lender with approximately six workstations, plus a manager).  Sales and support services were provided by Receivership Entities, operating through multiple websites and email domains.  Other Receivership Entities provided customer service, leased the office space, paid the employees, and actually funded the loans via a credit line to the Tribal Defendant.

### B.  Common Enterprise

Despite the multitude of entities, the reality confirmed by our review onsite is that Defendants operated as a common enterprise:

- Sales, processing, funding, and customer service for the three ostensible Tribal Defendant lenders was provided by the Receivership Entities, operating from the

8

Las Vegas location.  Receivership Entities paid the rent and the employees, controlled the lender website domains and email accounts.  *See also* Exhibit 2.

- All three lenders offered roughly the same loans on the same terms with the same form Loan Agreement and the respective sales teams operated from the same office location with the same scripts, collateral materials, and incentive systems. The only identifiable variance was that internal loan term sheets were color coded by lender (gold for Harvest Moon, green for Green Stream, and purple for Gentle Breeze).
- The cash generated by the business flowed freely between and among the Receivership Entities, the Individual Defendants and the Tribal Defendant.

In the safe in Naito's office, we found agreements[7] between the Tribal Defendant lenders and Receivership Entities[8] which appear designed to document their independence from each other, but actually reflect efforts to conceal the common enterprise.

## IV.

## Records Found at Las Vegas Site

The FTC's Complaint and evidence in support of the TRO and the PI allege that Defendants' payday loan operations violated Section 5(a) of the FTC Act, the FTC's Telemarketing Sales Rule, the Truth in Lending Act ("TILA"), and the Electronic Fund Transfer Act.  The exact nature of Defendants' practices is not directly a receivership matter.  While we have not sought to evaluate each of the FTC's allegations specifically, my review did identify practices consistent with the FTC's allegations.

A. **Misrepresentations and TILA Violations**

Materials we found onsite confirmed that misrepresentations about payment terms and procedures were ingrained in the business:

---

[7] We do not know whether the agreements located in the safe are current and whether there are amendments, revisions, or additional agreements not found in the safe.

[8] The Tribal Defendant lenders had Qualified Referral Service Agreements and Call Center Service Agreements with some of the Receivership Entities and Receivership Entity Naito Corp. entered into Promissory Note and Security Agreements with Tribal Defendant lenders by which, in effect, provided funding for payday loans.

9

- The form Consumer Loan Agreement used by all three lenders identified one payment, which included the principal and interest and service fee.  The reality was quite different – the number of payments were not finite and not applied to principal and interest, but to interest only such that loan amounts escalated.  *See* Exhibit 6 (customer obtained three payday loans totaling $350 and Gentle Breeze debited $3,827.17 from her bank account).  Central to this deception was the "refinance policy" or "payment options" where loans would be auto-refinanced (and payments applied only to finance charges) unless consumers affirmatively directed otherwise.  *See* Exhibit 7 at 4 ("Unless otherwise notified, your account will be debited the minimum amount due to refinance this loan for another term"); *see also* Exhibit 8 at 2 ("You will pay the Finance Charges on the Payment Due Date.  If you make only a Minimum Payment, you will have a remaining balance due of the principal amount of Your Loan plus any additional finance charges.").[9]
- Email exchanges between sales personnel and consumers further reflected these misrepresentations.  *See* Exhibit 9.
- Scripts found onsite were also premised on the same deception.  *See* Exhibit 10.
- The current form Consumer Loan Agreement is, by definition, not compliant with TILA – the required TILA disclosures (finance charge, APR, payment schedule, and total payments) are rendered inaccurate by the reality of the deceptive refinance policy and the escalation from one payment (principal, fees, and interest) to multiple payments (only fees and interest).  *See* Exhibit 8.

B. **Sales Incentives**

The materials onsite also reflected that Defendants were sales driven.  At our arrival, the space was organized with separate pods for each of the three lender sales teams and various whiteboards and notices reflected available bonuses for sales personnel and the tracking of sales

---

[9] In late April 2020, Defendants implemented a revised Consumer Loan Agreement, replacing the "Refinance Policy" provision with "Payment Options," providing three payment alternatives.  However, this revision did not remedy the TILA violations.  Since the most recent Consumer Loan Agreement for all three Tribal Defendant lenders are essentially identical, we include one recent Consumer Loan Agreement as an example.

10

activity by group within each lender pod. Sales personnel bonuses were based on based on the number of "E-signs" (or new customers) per pay period. *See* Exhibit 11.

**C.     Complaints**

Our review of complaints has further confirmed common consumer confusion: Consumers write to the company complaining they have more than paid off the loan amount, but are still being charged. *See* Exhibit 12 ("I have well paid off my loan (of only $200, and you've taken almost $800!!!); Exhibit 7 (consumer already paid $371.04 when agreement only required repayment of $291.97). Consumers complain about not being able to reach the company when they call to discuss payment options. *See* Exhibit 13 (trying to call 3 days before due date to payoff loan in full). Consumers are confused about the amount required to payoff their loans. *See* Exhibit 14.

## V.
## Financial

The Preliminary Financial Report of the receivership's forensic accountant, Exhibit 2, sets forth an operational and financial summary based on available records. Given the web of multiple interrelated entities, such a summary is not precise, but a preliminary estimate. Since financial activity was not recorded in separate accounts for the three lenders, our estimate of activity is presented on a consolidated basis.

For the period April 2011 to May 2020, the internal loan management system, PowerCheck, reports the following:

- 285,701 loans totaling $59,662,348.50.
- Total payments made by consumers of approximately $175.3 million ($26.1 million in principal repayment, $142.2 million fees and $7.1 million interest.)

Based on the Receivership Entities' QuickBooks records:

- Total income of the Receivership Entities $201,512,172.
- Gross profits of the Receivership Entities $159,704,280.

///

11

# VI.

## Can the Business be Conducted Profitably and Lawfully?

Section XII.T of the PI authorizes the Receiver to suspend business operations of the Receivership Entities if in his judgment such operations cannot be continued legally and profitably. Section XII.V further directs that if the Receiver reaches that judgment, he take various steps to protect consumers (*i.e.*, disable websites and telephone numbers or modify them to provide consumer education and/or informational purposes).

Given that Defendants have terminated active operations, my determination on this issue is essentially moot. Nonetheless, the materials we found onsite have confirmed active practices prohibited by the PI. Even lawful operators find the operation of a payday loan business to be challenging as it requires licenses, sophisticated systems, and vigilant compliance staff. These Defendants sought to avoid regulatory oversight by operating through a multitude of entities.

In order to protect consumers, we have modified Receivership Entities' websites to provide consumer education and have sent a global email to customers in the loan management system database.

Dated: July 20, 2020                          By:     /s/ Thomas W. McNamara
                                                      Thomas W. McNamara
                                                      *Court-Appointed Receiver*