**Justin Gray**

| | |
|---|---|
| **From:** | Justin Gray |
| **Sent:** | Friday, September 18, 2020 10:37 AM |
| **To:** | Ashe, Gregory; Clark, Helen |
| **Subject:** | RE: Questions for the Tribe |
| **Attachments:** | 2020 09 18 Stipulation to enter final order - Tribal Defendant  REDLINED.docx; Record Retention Schedule (final working draft 10-24-17).pdf; TLE Record Retention Policy (final draft 10-24-17).pdf |

Gregory,

As with most of our conversations and negotiations, I would like to keep the email below confidential and subject to the protections of FRE 408.

Attached please find my client's suggested edits to the proposed stipulated order.  Where appropriate, I've added comments to the proposed edits with explanations…hopefully that makes things easier.  The ideas are straightforward.

Also, below in red italics, are my client's responses to the questions presented a few weeks back.  I hope we understood the questions correctly and supplied the responses accordingly, but if we're certainly ready to supply follow-ups and additional information or clarification.

**Would you and Helen be free for a call over these on Monday or Tuesday next week?**

I know it's a short turn around, but the Tribe's General Council meets on September 24, so if we have final language by mid-week, I can present it for final approval to the General Council.

1. Identify any members of the Tribe involved in the drafting, reviewing, or modification of the loan agreements used by the TLE, and state their role.

*Answer:  My clients presume that this question seeks information about the drafting, reviewing, or modification of the consumer loan agreements used by the La Posta Tribal Lending Enterprise ("TLE").*

*Generally, the La Posta Band of Diegueno Mission Indians ("Tribe") created the TLE according to Tribal law and has always wholly owned the TLE.  The Tribe set up its business structure to allow the Tribe the ultimate control over the lending businesses. The Board of Directors ("Board") is tasked by the Tribe with the responsibility to perform all actions necessary and appropriate to operate the business for the benefit of the Tribe.  The Board is required to regularly report to Tribal Council and General Council on operations.*

*The Board has always been comprised solely of Tribal Members.  Current Board Members include: Cynthia Parada, Kaila Castello, Victor Estrada, Andrea Estrada, Jacqulyn Flores.  Past Board members have included Gwendolyn Lindholm and Duncer Estrada.*

*Early on, the Board, with approval of the General Council, contracted with vendors to manage the day-to-day operations of the business.  The Board oversaw the managers' day-to-day activities and retained authority to originate loans, execute loan documents, retained control over borrower criteria, and required the managers to obtain approval for high level operations decisions.  The management agreement terminated in 2014, and the Board then took on the day-to-day management responsibilities.  To accommodate the additional responsibilities, General Council increased the number of members on the Board from 3 to 5.*

*With this understanding, the Board approved the first consumer loan agreements, but because the consumer loan agreement had a limited waiver of tribal sovereign immunity, it was ultimately approved by the Tribe's*

1

*General Council. The Board thereafter reviewed and approved later modifications and amendments to the consumer loan agreements, however any modifications to the limited waiver were subsequently approved by the General Council. Early consumer loan agreements had been formed with boilerplate language provided by vendors and tailored to the Tribe, with the help of the Tribe's legal counsel and various advisors, including the Corporate Defendants. Later need for modifications and amendments came from the Board, Corporate Defendants, the Tribe or Board's legal counsel and compliance contractor. Modifications and disclosures were typically vetted and tested by Answers, Etc, the loan management software ("LMS") provider, which was contracted by one or more of the Corporate Defendants. While often times several people were involved in drafting and revising modifications and amendments, the ultimate approval for the consumer loan agreements was by the Board, and if a modification to the waiver of immunity is required, then also by the General Council. To the Board's knowledge, no consumer loan agreements were used that had not been approved by the Board in advance.*

2. Who determined the type of loans, i.e. installment vs "Indian time" (and who came up with that name)?

<u>Answer:</u>  *The Board created and approved the new "Indian Time" product. The Board created the name.*

*The traditional "payday loan" product—i.e., a small dollar loan to be wholly repaid with a single payment upon the borrower's next payday—became heavily scrutinized by state regulators and in DATE, the CFPB proposed its small dollar loan rules, which sought primarily to regulate payday loans. This caused concern throughout the online lending industry and the Board was well aware of the heightened attention to traditional payday loan products and south to change and improve its product.*

*On August 17, 2016, during a CFBP/Tribal Consultation regarding the CFPB's Proposed Rule on Payday, Vehicle Title, and Certain High Cost Installment Loans and Proposed Rule on Arbitration Agreements, the Board learned of the CFPB's efforts to regulate payday loans and by doing so, to indirectly tribal online lending. Following that meeting, the Board decided to change its consumer loan product offering to offer only an installment loan product that was preferred by customers and allowed customers to see the payment schedule and preventing the concerns related to disclosure of the APR in traditional payday products.*

*However, within a year after beginning to offer the installment product, the Corporate Defendants approached the Board and suggested that the Tribe business would make more money if it returned to a payday loan-like product. The Corporate Defendants proposed the idea of a new product that was a hybrid between a payday product and an installment product that would provide an amortized product with more flexibility to make varying payments of interest or interest and principal and the Board approved the product and came up with the "Indian Time" name.*

*In early 2020, the Board decided to return to a simple installment loan product and in April 2020, directed the Corporate Defendants to use a revised consumer loan agreement in the interim period while migrating from the "Indian Time" product to an installment loan product.*

3. Identify any members of the Tribe involved in the drafting, reviewing, or modification of the Harvest Moon Loans, Green Stream Lending, and Gentle Breeze Online websites, and state their role.

<u>Answer:</u>  *My client's recollection is that the Corporate Defendants recommended several brand names and the Board chose first Gentle Breeze Online, and thereafter also Harvest Moon Loans and Green Stream Loans. from among the recommendations. The websites were administered by Answers, Etc. and periodically reviewed by legal counsel and/or compliance officer and discussed with the Board.*

4. Identify any members of the Tribe involved in the drafting, reviewing, or modification of telemarketing scripts used to market the loans offered by Harvest Moon Loans, Green Stream Lending, and Gentle Breeze Online, and state their role.

<u>Answer:</u>  *The TLE is not involved in telemarketing or marketing. It purchases leads.*

5. What was the role of the Tribe in the lending process? Just issuing the loans and collecting payment? Who made underwriting and lending decisions?

*Answer:  The Tribe established the TLE to ensure that the Board retained control of the operation and made the ultimate decisions in borrower criteria and underwriting as well as application approval and loan origination.  To the extent changes were made after the Board's approval to the Board-approved parameters, criteria, or documentation, they were implemented without Board knowledge, understanding, or approval.*

6. How did the Tribe first come into contact with Naito/Ikeda? Did the Tribe approach them or did they approach the Tribe? Was there a middle-man?

*Answer:  To the best of my client's recollection, one of the Tribe's attorneys introduced Scott Merritt to the Tribe.  It was Scott Merritt who then introduced Mr. Naito and Mr. Ikeda to tribal leaders.*

7. What was the compensation structure for the Tribe? Roughly what percentage of fees/interest payments from consumers went to the Tribe?

*Answer:  TLE owns the business and is not compensated.  After paying operating expenses, the Tribe receives net income.*

8. Describe the level and subjects of communications between the Tribe and Naito/Ikeda.

*Answer:  The TLE and Tribe very seldom communicated directly with Mr. Naito.  Mr. Ikeda, along with the TLE's primary point of contact Ken Chung, regularly attended Board meetings*

*Board members and TLE employees also communicated fairly regularly with Mr. Chung outside of Board meetings regarding routine operations via email or phone call (e.g., problems with bank accounts, payment processors, consumer issues complaints, etc.)*

9. What role did the Tribe play in responding to consumer complaints? Was the Tribe aware that consumers complained it was difficult to contact Harvest Moon, Green Stream, and Gentle Breeze? Did the Tribe take steps to address consumer complaints regarding responsiveness or other issues?

*Answer:  Consumer complaints were generally initially received and handled by the vendor call center.  The Board established a complaint handling policy several years ago, and regularly reviewed complaint management by listening to recorded calls between agents and customers.  At times, complaints were elevated and the Board either directed the Corporate Defendants to resolve the dispute or take corrective action or, if the complaint originated from an attorney or state agency, responded directly.*

*Complaints from agencies like the Better Business Bureau were normally received directly by the TLE and handled by on-Reservation employees with input from the compliance contractor and/or legal counsel under the oversight of the Board.  And at times the Tribal Regulatory Authority has received customer complaints which were forwarded to the Board to allow the business an opportunity to resolve the matter.*

*Both the Tribal Regulatory Authority and the Board became aware that consumers were having difficulty reaching the call center and raised the issue several times to the Corporate Defendants including during annual regulatory audits.  In each instance, the Corporate Defendants offered an explanation suggesting that the situation was unique and had been resolved, or blaming the phone system, or blaming the consumer as a troublemaker trying to avoid obligations.  To the Board's knowledge, the Corporate Defendants had implemented routine training for call center employees repeatedly confirmed that steps were underway to improve access by consumers to call center agents.*

10. Describe the Tribe's efforts to address compliance issues with the Harvest Moon, Green Stream, and Gentle Breeze products and operation, including but not limited to efforts to address disclosure issues? What did those efforts consist of? What prompted the efforts? Please include the approximate timing of the efforts.

*Answer:* After a few years of operation, the Tribe began a more concerted effort to improve its lending operations, including improving its compliance management. The Board required the Corporate Defendants to develop a comprehensive set of operation policies and procedures, then undertook the task of updating and revising those policies and procedures. The Board also created a Compliance Committee that developed a process to manage consumer complaints as well as regularly reviewing policies, procedures, and practices. The Board required the Corporate Defendants to ensure call center agents received training more frequently and contracted with a third party trainer.

*To continue to improve, in 2018, the TLE hired a full time compliance officer, who has since taken actions to review and update the TLE's websites, templates for email accounts, instructed Corporate Defendant to implement certain complaint handling improvements and practices, revised the loan agreement, site visits to the call center, etc.*

11. The receiver collected multiple copies of a "Closing" script containing three options for consumers – "Roll-over", "Buy Down", and "Payoff" (the "Three Options Script"). Who developed the Three Options Script? When was it implemented? What closing script or other information was provided to consumers before the Three Options Script was implemented?

*Answer:* While the Board approved the "Indian Time" loan product, it was unaware that the Corporate Defendants had developed and implemented a script to verbally inform customers of the repayment options. The Board suspects that Corporate Defendants began using the script sometime in 2017, but cannot confirm when it was created or implemented. The Board was never given any advance copy or asked to consider the script before it was implemented.

*The Board has since learned that the script was originally used by Corporate Defendants' managers, then later call center agents were to use the script to verbally offer payback options. The Board has learned that the script was only read to approved applicants and that applications were encouraged to take time to consider options.*

*Once the Board became aware of the script, it expressed its disapproval as these options were not memorialized in the loan agreement. TLE undertook the process to revise the loan agreement and loan product. The TLE first revised the script then prepared an email to consumers to advise them of the repayment options in writing.*

12. What is the document retention policy for Harvest Moon Loans, Green Stream Lending, and Gentle Breeze Online? Who is principally responsible for implementation of the policy?

*Answer:* The document retention policy is attached. It applies to TLE and the call center.

13. What is the call recording policy for Harvest Moon Loans, Green Stream Lending, and Gentle Breeze Online? Are all inbound and outbound calls recorded or is only a subset recorded? Who is principally responsible for implementation of the policy?

*Answer:* The call recording policy is included in document retention policy.

14. Describe any quality control measures employed by the Tribe with respect to the Harvest Moon, Green Stream, and Gentle Breeze lending operations, including but not limited to measures employed with respect to communications with consumers.

*Answer:* The TLE's on-Reservation employees have regularly listened to call center call recordings and contacted Corporate Defendants to follow up on errors and recommend corrective action. TLE employees in consultation with the compliance contractor also reviewed emails and written communications.

Helen Clark
Attorney
Bureau of Consumer Protection
Federal Trade Commission
Phone: (202) 326-2273
Email: hclark@ftc.gov