Abran E. Vigil
Nevada Bar No. 7548
vigila@ballardspahr.com
BALLARD SPAHR LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
Tel.:    702-471-7000
Fax:    702-471-7070

*Attorneys for Court-Appointed Receiver,*
*Thomas W. McNamara*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:20-cv-00840-JAD-NJK |
| Plaintiff, | **NOTICE OF RECEIVER'S FINAL REPORT AND APPLICATION FOR: (1) DISCHARGE OF RECEIVER, AND (2) APPROVAL OF FINAL FEE APPLICATION** |
| v. | |
| LEAD EXPRESS, INC., et al., | |
| Defendants. | |

Thomas W. McNamara, as Receiver, by and through his undersigned counsel, hereby submits this Final Report for the Court's consideration, and hereby applies for discharge of the Receiver and approval of the Receiver's Final Fee Application for the period August 1, 2020 through April 30, 2021.  This Application is made pursuant to Sections XII.F and XVIII of the Order Granting Stipulation to Enter Preliminary Injunction Against the Corporate Defendants ("PI," ECF No. 44) and is based upon this Final Report and Application, the Declaration of Thomas W. McNamara, and upon such other pleadings and oral and documentary evidence as may be presented at or before the time of the hearing on the Application.

## INTRODUCTION

On May 11, 2020, the Federal Trade Commission ("FTC") initiated this lawsuit against corporate defendants Lead Express, Inc.; Camel Coins, Inc.; Sea Mirror, Inc.; Naito Corp.; Kotobuki Marketing, Inc.; Ebisu Marketing, Inc.; Hotei Marketing, Inc.; Daikoku Marketing,

1  Inc.; tribal entity La Posta Tribal Lending Enterprise (the "Tribal Defendant"); and individual

2  defendants Takehisa Naito ("Naito") and Keishi Ikeda ("Ikeda" and, collectively with Naito, the

3  "Individual Defendants") for alleged violations of Section 5(a) of the FTC Act, the FTC's

4  Telemarketing Sales Rule, the Truth in Lending Act, and the Electronic Fund Transfer Act in

5  connection with the offering and extension of credit in the form of high-fee, short-term "payday"

6  loans.  *See* ECF No. 1.

7  　　　　Mr. McNamara was appointed as the Receiver of the Receivership Entities[1] on June 19,

8  2020 with the Court's entry of a Stipulated Preliminary Injunction against the Corporate

9  Defendants.  *See* ECF No. 44 ("PI").  The Court has now entered a Stipulated Order for

10  Permanent Injunction and Monetary Judgment as to the Receivership Entities and Individual

11  Defendants, ECF No. 95, and the FTC's Motion for Default Judgment as to the Tribal Defendant

12  is pending, ECF No. 91.  With the case resolved as to the Receivership Entities, and having

13  fulfilled his duties under the PI, the Receiver now presents this Final Report and requests

14  discharge from his duties and final payment of fees and expenses.

15  **FINAL REPORT**

16  **I.    Commencement of the Receivership**

17  　　　　**A.    Appointment of the Receiver**

18  　　　　The Receiver was appointed by entry of the PI on June 19, 2020.  Concurrent, separate

19  preliminary injunctions were entered against each of the Individual Defendants, Naito (ECF No.

20  45) and Ikeda (ECF No. 46), as well as the Tribal Defendant (ECF No. 47, the "Tribal PI").

21  Neither of the Individual Defendants, nor the Tribal Defendant, were subject to the receivership.

22  However, the Tribal Defendant had a number of specific obligations related to the receivership,

23  which are discussed in greater detail below (*see* Sections II.A and III.A).

24

25  [1]  Receivership Entities are defined in the PI to mean the "Corporate Defendants [Lead Express, Inc., Camel Coins, Inc., Sea Mirror, Inc., Naito Corp., Kotobuki Marketing, Inc., Ebisu Marketing, Inc., Hotei Marketing, Inc., and Daikoku Marketing, Inc., and each of their

26  subsidiaries, affiliates, successors, and assigns] as well as any other entity that has conducted any business related to lending services, including receipt of Assets derived from any activity that is

27  the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Corporate Defendant or Individual Defendant."  *See* PI Definitions, paragraph K,

28  page 5.

The Receiver was given a number of duties under the PI including, but not limited to:

- Taking custody and control of the Receivership Entities' assets and documents, PI § XII.B;

- Preserving the value of the Receivership Entities' assets, PI § XII.D;

- Preventing the loss of the Receivership Entities' documents, PI § XII.E;

- Securing and taking exclusive custody of Receivership Entities' business location, PI §XII.H;

- Providing both the FTC and Defendants with access to the Receivership Entities' Documents, PI §XII.Q; and

- Suspending the Corporate Defendants' business operations if, in the Receiver's judgment, they could not continue lawfully and profitably, PI § VI.T.

The Defendants' business was terminated as of the entry of the Temporary Restraining Order ("TRO") and thereby rendered certain of the Receiver's duties (*e.g.*, determining whether or not the Corporate Defendants could continue to operate lawfully and profitably) unnecessary. The Receiver's efforts were thus largely limited to protection of consumer interests and asset recovery.

**B.     Receiver's Initial Entry**

On Friday, June 19, 2020, in preparation for securing the receivership site located at 101 Convention Center Drive, Suite 500, Las Vegas, Nevada, the Receiver arranged for the building's janitorial staff to conduct a commercial COVID-19 disinfection and cleaning in the suite.  When the receivership team arrived on Monday, June 22, there was no active business onsite.[2]  As the Receiver would later confirm by speaking with Defendants' counsel, Defendants had previously downsized their payday loan business due to the COVID-19 pandemic and had then shuttered the business completely when the TRO (ECF No. 13) was entered on May 19, 2020.

---

[2] Although the premises were expansive (approximately 11,000 square feet, leased at $17,000 per month), only 50% or so was in use at the time of entry.  Timecard records onsite indicated that approximately 25 employees were active leading up to May 19, 2020.

3

1    The Receiver proceeded, with the parties' consent, to secure the business records of the

2   Receivership Entities and vacate the premises.  Business records from the site were boxed and

3   approximately 250 boxes were shipped to the Receiver's secure storage area in San Diego.

4   Leased equipment was returned to its respective vendors and nearly all of the remaining furniture

5   and equipment (which had no realizable value) was removed by junk and recycling vendors.[3]  On

6   July 17, 2020, the premises were returned to the property manager.

7    **C.    Defendants' Business Operations**

8    While Defendants had ceased operations, the Receiver was still able to conduct a review

9   of their business practices and confirm that the basic contours of Defendants' business were

10   consistent with the allegations in the FTC's Complaint.  Defendants made generally small ($200-

11   $500), short-term payday loans to individuals, but the real revenue driver appeared to be high

12   finance charges (interest and fees) that inflated consumer "repayments" to many multiples of the

13   original loan.  Consumers were presented with three different "lenders" (Harvest Moon, Green

14   Stream, and Gentle Breeze), but each of the purported options they were shown was a dba of the

15   Tribal Defendant.  Defendants' business was run through the Tribal Defendant, but it was the

16   Receivership Entities which provided sales and support services, provided customer service,

17   leased the office space, paid the employees, and funded the loans (via a credit line to the Tribal

18   Defendant).  In all respects, Defendants operated their business as a common enterprise.

19    Because Defendants had already terminated their business operations, the Receiver did

20   not focus on whether or not their business had or could operate lawfully.  Nonetheless, and as

21   noted, materials that the Receiver's team found onsite were consistent with the FTC's allegations

22   and confirmed that Defendants' misrepresentations about payment terms and procedures were

23   ingrained in the business.  The Receiver's full assessment of Defendants' business operations is

24   presented in his Preliminary Report (ECF No. 65).

25

26

27

28
_____

[3] The Receiver was able to sell two 600-pound Sentry safes found in Naito's office for a total of $900.

4

1   **II.       Consumer Protection Efforts**

2          **A.       <u>Providing Notice and Updates to Consumers</u>**

3              Upon his appointment, the Receiver immediately suspended all consumer payments to

4   the Receivership Entities.  The Receiver later sent the following email notice to clients of

5   Defendants' business with active accounts regarding the imposition of the receivership and the

6   status of the case:

7              Re: Payday Loan Lawsuit – *FTC v. Lead Express, Inc., et al.*

8              ***DO NOT REPLY TO THIS EMAIL.  If you have questions, send them to
               harvestmoon@regulatoryresolutions.com

9              You have been identified as a customer of **Harvest Moon Financial**, **Gentle**

10             **Breeze Online**, or **Green Stream Lending**.  In May 2020, the Federal Trade
               Commission ("FTC") sued these companies and others for deceptive practices.

11             Shortly after the Court entered a Temporary Restraining Order ("TRO"), which
               froze defendants' assets and prohibited certain business activities, defendants

12             ceased business operations.

13             In June 2020, defendants stipulated to the entry of preliminary injunction, which
               included the appointment of a Receiver over Lead Express, Inc., Camel Coin,

14             Inc., Sea Mirror, Inc., Naito Corp., Kotobuki Marketing, Inc., Ebisu Marketing,
               Inc., Hotei Marketing, Inc., and Daikoku Marketing, Inc.  The Receiver has

15             established a website and copies of the complaint and Court orders are available
               here: https://regulatoryresolutions.com/case/federal-trade-commission-v-lead-

16             express-inc-et-al-harvest-moon-receivership/.  We will post updates on the
               Receiver's website as the case proceeds.

17
               With the company no longer operating, at this time the Receiver has suspended

18             payments for loans that you received from the company.  You should not see any
               automatic withdrawals taken and please do not send any money to the company.

19
               With regards to refunds, at this very early stage of the case, the Receiver is still

20             conducting his investigation and marshalling the assets of the Receivership
               Entities.  If the FTC prevails in the case, the matter of refunds will be an issue for

21             the FTC and the Court to resolve.  This determination is a long way down the
               road.

22
               Defendants in the FTC's complaint include: Lead Express, Inc., Camel Coin, Inc.,

23             Sea Mirror, Inc., Naito Corp., Kotobuki Marketing, Inc., Ebisu Marketing, Inc.,
               Hotei Marketing, Inc., Daikoku Marketing, Inc., La Posta Tribal Lending

24             Enterprise d/b/a Harvest Moon Financial, Gentle Breeze Online, and Green
               Stream Lending, Takehisa Naito, and Keishi Ikeda.

25             The Receiver also provided notice to consumers on the websites used by Defendants in

26  connection with their business operations.  The Tribal PI directed that the Internet domains for

27

28

                                                5

1  the websites,[4] which were nominally owned by the Tribal Defendant, be transferred to the

2  Receiver.  Following the transfer, the Receiver modified these websites to provide consumers

3  with information about the FTC's case and the receivership.

4        The Receiver's team also responded to consumer inquiries by both phone and email

5  throughout the pendency of the receivership.  The Receiver has also continued to update the

6  website as the case has progressed.  Most recently, on April 1, 2021, the Receiver updated the

7  website to reflect the entry of the permanent injunction and monetary judgment and to explain

8  the termination and discharge process.

9        **B.        Attempts to Identify Consumer Loans Sent to Collection**

10        In keeping with the directive to protect the consumer victims, the Receiver reviewed the

11  Defendants' delinquent loan collection practices, focusing on whether accounts were sent to

12  third-party collectors and whether negative information was reported to credit reporting agencies

13  ("CRAs").  The goal was to identify those consumer accounts sent to third-party collectors and

14  direct the collectors to cease any collection efforts and remove any negative information reported

15  to CRAs.  Ultimately, however, a review of the Defendants' records led the Receiver to conclude

16  that reliably identifying third-party collection accounts was not feasible.  Defendants' loan

17  management database did not identify the collection agency or agencies to which delinquent

18  loans were referred.  Because the Receiver's initial entry took place after the Defendants had

19  closed down their business, the Receiver's team did not have the opportunity to interview

20  employees who might have been able to shed light on this issue.

21        **C.        Abandonment of Outstanding Consumer Debt**

22        The Stipulated Order for Permanent Injunction and Monetary Judgment entered against

23  the Corporate and Individual Defendants (ECF No. 95, "SPI") converted existing consumer debt

24  to "paid in full" status, but only where "such Existing Debt exceed[ed] the amount financed plus

25  one finance charge."  *Id.* § V.A.  Any debts still remaining – that is, principal and one interest

26  payment – were then transferred and assigned to the Receiver pursuant to the SPI.  *Id.* § V.C.

27  _____

28  [4]  The relevant websites were gentlebreezeonline.com, mygbo.com, harvestmoonloans.com, hmlogin.com, gsllogin.com, and greenstreamlending.com.

1  Prior to the entry of the Stipulated Order, the Receiver's team examined the feasibility of

2  collecting outstanding principal and one interest payment from consumers.  The analysis

3  revealed relatively large amounts of potential consumer collections, but each of the loans and

4  associated single interest charge were small in size, roughly $200.  The collection of these

5  thousands of very small loans was not feasible for the receivership team and would require the

6  use of a third-party debt collector.  Ultimately, the Receiver concluded the best course was to

7  abandon this collection of outstanding loans, particularly given the allegations at the heart of this

8  lawsuit.  This determination was conveyed to counsel for the FTC and the Receivership Entities

9  and Individual Defendants several months ago.  The FTC indicated it had no objection to this

10  approach.  Counsel for the Receivership Entities and Individual Defendants was contacted twice

11  and indicated that he did not believe his clients would not have an objection to this approach, but

12  did not provide a final answer.

13  **III.    Asset Management and Recovery**

14        **A.    Transfer of Assets from Tribal Defendant**

15        The terms of the Tribal PI required the Tribal Defendant to transfer to the Receiver funds

16  from any accounts held in its name or one of its DBAs (Harvest Moon Financial, Green Stream

17  Lending, and Gentle Breeze Online) at First National Bank Albany/Breckenridge, PeopleFirst

18  Bank, First Dakota National Bank, CNB Bank & Trust, N.A., North American Banking

19  Company, and Chippewa Valley Bank.  To the extent that the banks still held funds on behalf of

20  the Tribal Defendant, the funds were transferred.

21        **B.    Repayment of Paycheck Protection Program Loans**

22        Pursuant to Section XIII.A of the PI, the Receiver contacted Open Bank and Wells Fargo

23  Bank, N.A. to request that funds held by the banks on behalf of the Receivership Entities be

24  transferred to the Receiver.  Both banks complied, but counsel for Open Bank notified us that

25  three of the Receivership Entities (Ebisu Marketing Corp., Naito Corp., and Kotobuki Marketing,

26  Inc.) had borrowed funds from the bank under the Small Business Administration's Paycheck

27  Protection Program ("PPP"), which was implemented under the Section 1102 of the CARES Act.

28  The aggregate outstanding amount of the loans was $438,052.13.

7

| Borrower Name | PPP Loan Principal | Accrued Interest | Total Payoff Amount |
|---|---|---|---|
| Ebisu Marketing, Inc. | $15,300 | $40.66 | **$15,340.66** |
| Kotobuki Marketing, Inc. | $362,400 | $853.88 | **$363,253.88** |
| Naito Corp. | $59,300 | $157.59 | **$59,457.59** |
| **Total** | **$437,000** | **$1,352.13** | **$438,052.13** |

The balance of the Open Bank accounts held by Receivership Entities exceeded the amount of the PPP loans. Open Bank therefore requested that these PPP loans be repaid before it would transfer the remaining funds to the Receiver. On July 23, 2020, the parties filed a Joint Motion to Repay Receivership Entities' Paycheck Protection Program Loans and Sell Receivership Entities' Vehicles (ECF No. 67) requesting an Order approving the repayment of the loans along with the liquidation of the three vehicles held in the names of Receivership Entities. On August 7, 2020, the Court entered an Order granting the Joint Motion (ECF No. 69). The Receiver coordinated with the bank's counsel to accomplish the repayment of the PPP loans and the funds remaining in the Open Bank accounts after repayment – an aggregate amount of $666,312.96 – were transferred to the Receiver.

C.    Sale of Assets

Defendants turned over three vehicles to the Receiver: a 2015 GMC Yukon Denali, a 2016 Hyundai Tucson SE, and a 2016 Mercedes-Maybach S600. The Receiver was authorized to sell these vehicles following the Court's grant of the parties' Joint Motion. *See* ECF No. 69.

After researching local consignment options and other sales channel options, the Receiver entered into a consignment arrangement with a local dealer in Las Vegas to store and consign the vehicles. A member of the receivership team inspected each of the three vehicles. The Tucson and Yukon Denali, in particular, were both high-mileage vehicles in need of extensive repair work. In order to minimize repair and storage costs, the Receiver directed that only essential repairs be made. Both vehicles sold within 30 days.

The 2016 Mercedes S600 Maybach had low mileage and was in relatively good condition although multiple service lights were on. No offers were received in the first 60 days. The owner of the company consigning the vehicle then expressed an interest. After some negotiation, the owner of the company offered to purchase the Maybach for $70,000, waive his commission,

1   and absorb the costs previously incurred to prepare the vehicle for sale.  In order to ensure the

2   offer was a fair one, the Receiver's office asked RM Sotheby's (a large high-end automobile

3   auction house the Receiver has used in the past) to provide an estimate of the Maybach would

4   sell for if run through a Sotheby's auction.  Sotheby's charges a ten percent commission on

5   vehicles sold at auction and estimated that the vehicle would sell for between $65,000 and

6   $70,000, meaning that the Receivership Estate was only likely to net a maximum $63,000 at

7   auction.  Because the consignment company owner's offer allowed the Receiver to avoid paying

8   a commission and net the entire sale price of $70,000 to the Receivership Estate, the Receiver

9   concluded that the consignment company owner's offer represented a good price for the vehicle

10  and accepted it.

11        The sale of the vehicles netted the Receivership Estate $93,680 ($16,515 for the 2015

12  GMC Yukon Denali, $7,165 for the 2016 Hyundai Tucson SE, and $70,000 for the 2016

13  Mercedes-Maybach S600).  In addition to the three vehicles, the Receiver was able to sell two

14  safes found onsite for $900.  In total, the Receiver's asset sales efforts netted the Receivership

15  Estate $94,580.

16  **IV.    Receivership Accounting**

17        Attached as Exhibit A is a Receipts and Disbursements Summary for the receivership

18  period through April 30, 2021.  It shows aggregate receipts of $1,282,812.31, less disbursements

19  of $177,111.63, for net cash as of this Final Report of $1,105,700.68.

20                    **<u>APPLICATION FOR DISCHARGE AND</u>**

21                  **<u>APPROVAL OF FINAL FEE APPLICATION</u>**

22        On April 1, 2021, the Court entered the Stipulated Order for Permanent Injunction and

23  Monetary Judgment as to Defendants Lead Express, Inc.; Camel Coins, Inc.; Sea Mirror, Inc.;

24  Naito Corp.; Kotobuki Marketing, Inc.; Ebisu Marketing, Inc.; Hotei Marketing, Inc.; Daikoku

25  Marketing, Inc.; Takehisa Naito; and Keishi Ikeda (ECF No. 95), resolving the underlying case

26  against the Receivership Entities.[5]

27  _____

28  [5] On November 20, 2020, the FTC filed its Motion for Entry of Default Judgment Against Tribal
    Defendant La Posta Tribal Lending Enterprise (ECF No. 91).  This motion has been fully briefed
    and the entry of default is pending before the Court.  Because the Tribal Defendant was never

1    With the case now resolved as to the Receivership Entities, Mr. McNamara files this

2  Application for Discharge on the grounds that he has completed his duties as defined in the PI.

3    The Final Fee Application seeks approval to pay fees and expenses for services during

4  the nine-month period August 1, 2020 through April 30, 2021 as follows: $18,662.50 fees and

5  $256.06 expenses to the Receiver and his staff payable to TWM Receiverships Inc., dba

6  Regulatory Resolutions; $11,239.50 fees and $13.90 expenses to Receiver's counsel McNamara

7  Smith LLP; and $1,995.80 fees to Receiver's local counsel Ballard Spahr LLP.[6]

8    The Final Fee Application also seeks authorization to hold back $7,500 as a reserve for

9  final administrative costs, *e.g.*, document and electronics storage costs, removal and destruction

10  of computer hard drives, and document destruction costs, which may be expended without

11  further order of the Court, and after 120 days any unexpended funds from that reserve shall be

12  disbursed to Plaintiff Federal Trade Commission.  If the invoices in this Final Fee Application

13  are approved for payment in full, and the requested reserve of $7,500 is approved, net cash for

14  immediate transfer to the FTC will be $1,066,032.92.

15    The Final Fee Application is made pursuant to Section XVIII of the PI, which provides

16  that the Receiver "and all personnel hired by the Receiver as herein authorized, including

17  counsel to the Receiver and accountants, are entitled to reasonable compensation for the

18  performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses

19  incurred by them, from the Assets now held by, in the possession or control of, or which may be

20  received by, the Receivership Entities."

21    The Application is based upon the Final Report, the Declaration of Thomas W.

22  McNamara, and the proposed Order filed concurrently with this Application, the pleadings in

23  this matter, and such other oral and documentary evidence that may be presented at or before the

24  time of the hearing on the Application.

25  _____

26  subject to the receivership, however, its pending status should not affect the instant application for discharge.

27  [6]  The Receiver's forensic accountant's time for June 22-26, 2020 (fees of $6,278.00) was not previously included on the Receiver's First Interim Fee Application (ECF No. 73).  The Receiver

28  respectfully requests the Court's approval to pay these fees.

Dated:  May 7, 2021

BALLARD SPAHR LLP


By:    /s/ Abran E. Vigil
       Abran E. Vigil (NV 7548)
       BALLARD SPAHR LLP
       1980 Festival Plaza Drive, Suite 900
       Las Vegas, NV 89135-2958
       Tel.:    702-471-7000
       Fax:    702-471-7070

       *Attorneys for Court-Appointed Receiver,
       Thomas W. McNamara*

11

## CERTIFICATE OF SERVICE

I hereby certify that on the 7TH day of May, 2021, pursuant to Fed. R. Civ. P. 5(b), I served via CM/ECF or delivered by email and mailing in the U.S. Mail, a true and correct copy of the foregoing **NOTICE OF RECEIVER'S FINAL REPORT AND APPLICATION FOR: (1) DISCHARGE OF RECEIVER, AND (2) APPROVAL OF FINAL FEE APPLICATION**, postage prepaid and addressed to the following:

**VIA CM/ECF**
Gregory A. Ashe / Helen Clark
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
Tel.:    202-326-3719 (Ashe)
Tel.:    202-326-2273 (Clark)
Fax:    202-326-3768
gashe@ftc.gov; hclark@ftc.gov
*Attorneys for the Federal Trade Commission*

**VIA CM/ECF**
Lindsay Ager, Assistant U.S. Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, NV 89101
Tel.:    702-388-6336
Fax:    702-388-6787
lindsay.ager@usdoj.gov
*Attorneys for the Federal Trade Commission*

**VIA CM/ECF**
M. Migali Mercera
Pisanelli Bice PLLC
400 South 7th Street, Suite 300
Las Vegas, NV 89101
Tel.:    702-214-2100 / Fax:    702-214-2101
mmm@pisanellibice.com
*Attorneys for Defendants Lead Express, Inc.; Camel Coins, Inc.; Sea Mirror, Inc.; Naito Corp.; Kotobuki Marketing, Inc.; Ebisu Marketing, Inc.; Hotei Marketing, Inc.; Daikoku Marketing, Inc.; Takehisa Naito; and Keishi Ikeda*

**VIA CM/ECF**
David N. Anthony (*Pro Hac Vice*)
Michael E. Lacy (*Pro Hac Vice*)
Timothy A. Butler (*Pro Hac Vice*)
Ryan J. Strasser (*Pro Hac Vice*)
Troutman Sanders
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 303008
Tel.:    404-885-3000
david.anthony@troutman.com;
michael.lacy@troutman.com;
timothy.butler@troutman.com;
ryan.strasser@troutman.com
*Attorneys for Defendants Lead Express, Inc.; Camel Coins, Inc.; Sea Mirror, Inc.; Naito Corp.; Kotobuki Marketing, Inc.; Ebisu Marketing, Inc.; Hotei Marketing, Inc.; Daikoku Marketing, Inc.; Takehisa Naito; and Keishi Ikeda*

**VIA CM/ECF**
Justin Gray (*Pro Hac Vice*)
Rosette, LLP
44 Grandville Avenue SW, Suite 300
Grand Rapids, MI 49503
Tel.:    616-655-1601 / Fax:    517-913-6443
jgray@rosettelaw.com
*Attorney for Defendant La Posta Tribal Lending Enterprise dba Harvest Moon Financial, dba Gentle Breeze Online, dba Green Stream Lending*

**VIA CM/ECF**
Kenneth E. Hogan
Hogan Hulet PLLC
1140 N. Town Center Dr., Suite 300
Las Vegas, NV 89144-0596
Tel.:    702-800-5482 / Fax:    702-800-5482
ken@h2legal.com
*Attorney for Defendant La Posta Tribal Lending Enterprise dba Harvest Moon Financial, dba Gentle Breeze Online, dba Green Stream Lending*

   /s/ Abran Vigil
Abran Vigil
*Attorneys for the Court-Appointed Receiver, Thomas W. McNamara*