# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Federal Trade Commission, | Case No.: 2:20-cv-00840-JAD-NJK |
| Plaintiff | **Order Granting Motion for Default Judgment, Directing Final Judgment Against La Posta Tribal Lending Enterprise, and Closing Case** |
| v. | |
| Lead Express, Inc., et al., | [ECF No. 91] |
| Defendants | |

The Federal Trade Commission (FTC) brings this action against numerous defendants—corporations, individuals, and the La Posta Tribal Lending Enterprise (TLE)—for violations of various federal laws, rules, and regulations arising out of payday-lending schemes.[1]  Good-faith negotiations led to stipulated preliminary injunctions between the FTC and each defendant, as well as settlements with all defendants except the TLE.[2]  When talks broke down, the TLE notified the FTC that it would cease operations and dissolve in accordance with tribal and common law.[3]  Default was then entered against the TLE,[4] and the FTC now moves for default judgment.[5]  Because its claim satisfies the seven-factor analysis laid out by the Ninth Circuit in *Eitel v. McCool*,[6] I grant its motion, permanently enjoin the TLE from consumer lending, award the FTC $5,073,597 in disgorgement damages, and close this case.

---

[1] ECF No. 1 (complaint).

[2] ECF Nos. 34–37 (stipulations to enter preliminary injunctions); 44–47 (orders granting preliminary injunctions); 94 (stipulation to enter consent judgments); 95 (order granting consent judgments).

[3] ECF Nos. 92-8 (correspondence between the FTC and the TLE regarding the TLE's dissolution); 92-7 (Tribal Resolution closing the TLE and repealing its authorizing ordinance).

[4] ECF No. 90 (clerk's entry of default).

[5] ECF No. 91 (the FTC's default-judgment motion).

[6] *Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986).

**Background**[7]

The TLE—also doing business as Harvest Moon Financial, Gentle Breeze Online, and Green Stream Lending—is a tribal lending enterprise chartered under the laws of the La Posta Band of Diegueño Mission Indians (the Tribe).[8]  Since at least 2011, acting alone or in concert with others, the TLE advertised, marketed, distributed, or sold the extension of credit in the form of high-fee, short-term loans to consumers throughout the United States and participated in the collection on those loans.[9]  Prior to its dissolution on October 22, 2020,[10] the TLE transacted business in this district and throughout the United States.[11]

This payday-lending scheme involved the TLE and its co-defendants telling consumers that their loan obligations would be repaid using a fixed number of specific-amount payments.[12] In reality, defendants initiated repeated finance-charge-only withdrawals, without ever crediting those withdrawals to consumers' principal balances;[13] they only stopped when consumers took last-resort actions like closing their bank accounts or reporting them to law enforcement.[14]  This led many consumers to pay significantly more than what defendants represented they would pay.[15]  In numerous instances, defendants made it difficult, if not impossible, for consumers to

---

[7] These well-pled facts are deemed true by virtue of the TLE's default.  *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987) (per curiam); Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied.").

[8] ECF Nos. 1 at ¶ 14; 3-7 at 24.

[9] ECF No. 1 at ¶¶ 14, 19.

[10] ECF No. 92-7.

[11] ECF No. 1 at ¶ 14.

[12] *Id.* at ¶ 20.

[13] *Id.*

[14] *Id.* at ¶¶ 43–44.

[15] *Id.* at ¶ 20.

obtain copies of their loan agreements or contact defendants to discuss the loan terms or pay off their loans.[16]  Defendants also routinely made unauthorized electronic fund transfers from consumers' bank accounts, failed to make required credit-transaction disclosures, and unlawfully used remotely created checks to process payments for loans offered through telemarketing.[17]

The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act (FTCA),[18] Section 6(b) of the Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act),[19] Section 108(c) of the Truth in Lending Act (TILA),[20] and Section 918(c) of the Electronic Fund Transfer Act (EFTA).[21]  It seeks temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for defendants' acts or practices in violation of Section 5(a) of the FTCA,[22] the FTC's Telemarketing Sales Rule (TSR),[23] TILA[24] and its implementing Regulation Z,[25] and EFTA[26] and its implementing Regulation E,[27] in connection with the payday-lending scheme.

---

[16] *Id.* at ¶¶ 20, 40.

[17] *Id.* at ¶ 21.

[18] 15 U.S.C. §§ 53(b), 57b.

[19] 15 U.S.C. § 6105(b).

[20] 15 U.S.C. § 1607(c).

[21] 15 U.S.C. § 1693o(c).

[22] 15 U.S.C. § 45(a).

[23] 16 C.F.R. Part 310.

[24] 15 U.S.C. §§ 1601–1666j.

[25] 12 C.F.R. Part 1026.

[26] 15 U.S.C. §§1693–1693r.

[27] 12 C.F.R. Part 1005.

1       On May 19, 2020, I granted in part the FTC's ex parte motion for a temporary restraining

2   order with asset freeze against all defendants.[28]  On June 19, 2020, I granted stipulated

3   preliminary injunctions against all defendants, continuing the terms of the TRO and asset freeze

4   and appointing a receiver over some defendants.[29]  Due to ongoing settlement negotiations

5   among the parties, I thrice extended the defendants' deadline to answer or otherwise respond to

6   the complaint.[30]  Settlement talks between the TLE and the FTC broke down, and instead of

7   filing a response by the extended deadline, on October 22, 2020, the Tribe dissolved the TLE.[31]

8   Three weeks later, the Clerk of the Court entered default against the TLE.[32]  The FTC now

9   moves for entry of default judgment,[33] the TLE has responded,[34] and the FTC has replied.[35]

**Discussion**

11      Federal Rule of Civil Procedure 55(b)(2) permits a plaintiff to obtain default judgment

12  from the court if the clerk previously entered default based on defendant's failure to defend.[36]

13  The court has discretion to enter a default judgment,[37] which is guided by the seven *Eitel* factors:

14              (1) the possibility of prejudice to the plaintiff; (2) the merits of
                plaintiff's substantive claim; (3) the sufficiency of the complaint;

---

[28] ECF No. 13 (order granting in part TRO); *see also* ECF No. 3 (TRO motion).

[29] ECF Nos. 44–47.

[30] ECF Nos. 40, 68, 75.

[31] ECF No. 84-1 at 3 ¶ 11.

[32] ECF No. 90.

[33] ECF No. 91.

[34] Although the TLE submitted its response in the form of a letter, I construe it as a response brief.  ECF No. 92.  This district's local rules require that all case-related correspondence with the court "be styled as a motion, stipulation, or notice," and not as "letters, emails, or facsimiles." L.R. IA 7-1(b).  The TLE is advised to comply with this and all other local rules in the future.

[35] ECF No. 93.

[36] *See* Fed R. Civ. P. 55(b)(2).

[37] *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

> (4) the sum of money at stake in the action; (5) the possibility of a
> dispute concerning material facts; (6) whether the default was due
> to excusable neglect; and (7) the strong policy underlying the
> Federal Rules of Civil Procedure favoring decisions on the
> merits.[38]

As default has already been entered in this case, I must take all the complaint's factual allegations as true, except those relating to damages.[39]   "[N]ecessary facts not contained in the pleadings, and claims [that] are legally insufficient, are not established by default,"[40] and the court can consider additional proof of facts or damages to ensure that default judgment is appropriate.[41]

## I.   Possibility of prejudice to the plaintiff

The first *Eitel* factor asks whether the plaintiff will suffer prejudice if a default judgment is denied.[42]   Although the record shows that the TLE began negotiations with the FTC in good faith and initially sought an amicable resolution, it is clear that the parties were at an impasse as early as last fall.[43]   And rather than try to resolve the dispute through the judicial process, the TLE decided to dissolve in an attempt to cut off this litigation.[44]   Because the TLE has indicated that it does not intend to engage in this matter any further, absent default judgment, the FTC will suffer prejudice as it will have no other means to resolve its claims.  I find that this factor favors granting default judgment.

---

[38] *Eitel*, 782 F.2d at 1471–72.

[39] *See TeleVideo Sys.*, 826 F.2d at 917–18.

[40] *Cripps v. Life Ins. Co.*, 980 F.2d 1261, 1267 (9th Cir. 1992).

[41] *See* Fed. R. Civ. P. 55(b)(2).

[42] *Cf. NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 616–17 (9th Cir. 2016).

[43] *See* ECF No. 92-8.

[44] *See id.* at 3.

5

**II.     The claims' merits and the complaint's sufficiency**

The second and third *Eitel* factors focus on whether the plaintiff has stated meritorious claims under which it can recover.[45]  In its complaint, the FTC alleges that the TLE, acting in common enterprise with its co-defendants, deceptively marketed and serviced payday loans to consumers nationwide.[46]  In so doing, the TLE violated Section 5 of the FTCA, the TSR, TILA and Regulation Z, and EFTA and Regulation E by: (1) misrepresenting the payment terms of their payday loans, (2) failing to make accurate TILA and Regulation Z disclosures, (3) failing to obtain consumers' written authorization for recurring electronic-fund transfers, and (4) unlawfully using remotely created checks.[47]  The FTC's complaint also lays out that these violations entitle it to injunctive and monetary relief.[48]  I find that its claims are sufficiently pled.

Taking those well-pled allegations as true,[49] I also find that the FTC's claims have merit. Section 5 of the FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce."[50]  An act or practice is deceptive if it involves a material representation or omission that is likely to mislead consumers acting reasonably under the circumstances.[51]  The TSR prohibits sellers and telemarketers from "misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristic of goods or services

---

[45] *See Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978).

[46] *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142–43 (9th Cir. 2010) (holding that a "common enterprise" exists and can be held jointly liable for violations of the FTCA when there are "strongly interdependent economic interests" among the companies and "all of the companies were beneficiaries of and participants in a shared business scheme").

[47] ECF No. 1 at ¶¶ 50–52, 59–62, 72–75, 80–81.

[48] *Id.* at ¶¶ 83–84.

[49] *TeleVideo Sys.*, 826 F.2d at 917–18.

[50] 15 U.S.C. § 45(a).

[51] *See, e.g.*, *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009).

that are the subject of a sales offer."[52]   The TSR also proscribes sellers and telemarketers from "creating or causing to be created, directly or indirectly, a remotely created payment order as payment for goods or services offered or sold through telemarketing."[53]   The FTC has sufficiently shown that the TLE misrepresented the cost of the payday loans they offered to consumers via telemarketing and accepted remotely created checks for payment, violating these prohibitions.[54]

TILA and Regulation Z require lenders of closed-end credit to clearly and conspicuously disclose certain repayment terms to consumers in a manner that consumers may keep with them before extending credit.[55]   Advertisements for closed-end credit must also clearly and conspicuously disclose certain repayment terms.[56]   EFTA and Regulation E require written consumer authorization prior to electronic fund transfers from consumers' accounts.[57]   The FTC has sufficiently shown that the TLE failed to make required disclosures to consumers or obtain required authorizations, violating these requirements.[58]   These two factors weigh in favor of granting default judgment.

---

[52] 16 C.F.R. § 310.3(a)(2)(iii).

[53] 16 C.F.R. § 310.4(a)(9); *see* 16 C.F.R. § 310.2(cc).

[54] ECF Nos. 1 at ¶¶ 50–52, 59–60, 61–62; 3 at 20–35, 41–42.

[55] 15 U.S.C. §§ 1631(a), 1638(b)(1); 12 C.F.R. §§ 1026.17, 1026.18.

[56] 15 U.S.C. §§ 1664(a), 1664(d); 12 C.F.R. § 1026.24(d).

[57] 15 U.S.C. § 1693e(a); 12 C.F.R. § 1005.10(b).

[58] ECF Nos. 1 at ¶¶ 72–75, 80–81; 3 at 35–41.

III.    **Sum of money at stake**

Under the fourth *Eitel* factor, courts consider the amount of money at stake in relation to the seriousness of the defendant's conduct.[59] Here, the declaration attached to the FTC's motion for default judgment shows that the TLE was unjustly enriched in the amount of $5,073,597 by taking advantage of numerous consumers across the country.[60] Although this factor generally counsels against granting default judgments with large monetary awards,[61] district courts have the power to order all necessary "equitable monetary relief," including disgorgement and restitution.[62] Because the FTC seeks disgorgement of the TLE's payday-lending-related profits in the three years prior to the FTC's complaint, I find that this factor favors granting a default judgment against the TLE.

---

[59] *See NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 617 (9th Cir. 2016) (upholding district court's examination of damages, which involved a determination of whether plaintiff "only seeks contractual damages directly proportional to [defendant's] breach of the contracts") (internal quotation marks and citation omitted); *see also Twentieth Century Fox Film Corp. v. Streeter*, 438 F. Supp. 2d 1065, 1071 (D. Ariz. 2006) ("[Courts consider] the amount of money at stake in relation to the seriousness of [defendant's] conduct.").

[60] ECF No. 91-1. The FTC's complaint and default-judgment motion sought a monetary judgment of $9,609,310, but that amount did not reflect the proper, shorter statute of limitations. *See* ECF No. 97 at 2.

[61] *See Eitel*, 782 F.2d at 1472.

[62] *Stefanchik*, 559 F.3d at 931; *see also Liu v. SEC*, 140 S. Ct. 1936, 1943–44 (2020) (affirming that disgorgement of profits is an equitable remedy); *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 372–73 (2d Cir. 2011) ("disgorgement is a distinctly public-regarding remedy . . . to deter violations of the laws by depriving violators of their ill-gotten gains" (cleaned up)); *FTC v. Febre*, 128 F.3d 530, 537 (7th Cir. 1997); *see also SEC v. JT Wallenbrock & Assoc.*, 440 F.3d 1109, 1113 (9th Cir. 2006) ("the district court has broad equity powers to order the disgorgement of 'ill-gotten gains'"); *FTC v. BurnLounge, Inc.*, 584 F. App'x. 315, 318 (9th Cir. 2014) (disgorgement should include "all gains flowing from the illegal activities").

IV.   **Possibility of dispute over material facts**

The fifth *Eitel* factor considers whether, given that all the complaint's allegations are taken as true,[63] disputes regarding material facts could arise.  A fact is material if it could affect the outcome of the case.[64]  In its response brief, the TLE challenges the FTC's default-judgment motion on three issues.  First, the TLE complains that the FTC did not inform the court that the TLE had "participated in good faith settlement discussions" with the FTC, and that this participation shows that the TLE had reason not to "answer or otherwise defend" against the claims.[65]  Consequentially, the TLE does not allege that it *had* answered or defended in a manner that would preclude entry of default judgment.  The FTC's failure to mention settlement negotiations is immaterial because those talks did not result in a settlement.  When negotiations ended, the TLE had the opportunity to answer, and it did not do so.

Second, the TLE suggests that this court does not have jurisdiction to issue a judgment against it because the TLE has dissolved.[66]  Although neither the FTC nor the TLE offer relevant, binding authority on this question,[67] I conclude that judgment can be entered against the TLE despite its dissolution.  The TLE was an "unincorporated business entity" wholly owned by the Tribe and structured to "conduct business, hold and maintain assets" in its own name and not

---

[63] *TeleVideo Sys.*, 826 F.2d at 917–18.

[64] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[65] ECF No. 92 at 1–3.

[66] *See id.*  The TLE vaguely references that it was "prepared to move . . . for dismissal based on its sovereign immunity" in this litigation but instead sought to settle.  *Id.* at 3.  But because the TLE does not affirmatively raise this argument, I need not decide it.

[67] ECF Nos. 91 at 23 (the FTC citing unpublished district-court cases about dissolved *corporations* under *state law*); 92 at 4–6 (the TLE citing Supreme Court and Ninth Circuit cases about dissolved *corporations* at *common law*); 93 at 4–5 (the FTC citing unpublished district-court cases and Ninth Circuit cases about *unincorporated* entities in the context of *diversity jurisdiction*).

the Tribe's.[68]  However, the TLE and the FTC agree that this entity was an "arm" or agency of

the Tribe.[69]  The FTC argues that other district courts have entered default judgments against

dissolved state-law-based corporations, and that as an arm of the Tribe, the TLE cannot be

"dissolved for purposes of ceasing this litigation or stripping this Court of jurisdiction."[70]  The

TLE, too, argues by analogy to corporations, contending that the principle that all pending

litigation abates when common-law corporations cease to exist should apply to the TLE.

      At common law, and unlike a corporation, an unincorporated entity does not exist

separate and apart from the individuals who compose it; it "therefore lack[s] the capacity to be

sued in its own name[]."[71]  Rule 17(b)(3)(A) abrogates that common-law understanding in the

context of a suit to "enforce a substantive right" arising under federal law.[72]  Because the FTC

seeks to enforce rights established under federal law, the pre-dissolution TLE was a proper

defendant in this case, and the TLE's mid-litigation dissolution does not change that.  Any

analogy to a corporation—by either party—is unavailing.  A court cannot treat as a corporation

an entity that is formally and undisputedly unincorporated.[73]  The TLE is neither a state-law-

authorized corporation that continues to exist for a set number of years post-dissolution, nor a

common-law corporation that ceases to exist immediately, ending all pending litigation.  As an

---

[68] ECF No. 92-7 at 2.

[69] *Id.* at 3; ECF No. 93 at 5 n.4.

[70] ECF No. 93 at 5.

[71] *Strotek Corp. v. Air Transp. Ass'n. of Am.*, 300 F.3d 1129, 1133 n.2 (9th Cir. 2002).

[72] *See* Fed. R. Civ. P. 17(b)(3)(A); *Denver & R. G. W. R. Co. v. Bhd. of R. R. Trainmen*, 387 U.S. 556, 559 (1967).

[73] *Cf. Am. Vantage Cos., Inc. v. Table Mountain Rancheria*, 292 F.3d 1091, 1100 (9th Cir. 2002), as amended on denial of reh'g (July 29, 2002) (rejecting argument that an entity "should be deemed a corporation notwithstanding its formally unincorporated status").

1  unincorporated arm of a tribe that still exists, the TLE continues to exist, if only for purposes of

2  this litigation.

3         The TLE's third argument is that the monetary judgment sought by the FTC is excessive

4  because the TLE's assets are "less than $150,000" and during settlement negotiations the FTC

5  said "it would be satisfied with the seizure" of all the TLE's bank accounts.[74]  The TLE does not

6  dispute the amount of ill-gotten gains alleged by the FTC, it just argues that the FTC would not

7  be able to recover against it for more than its paltry assets.  That may be so, but, as with the

8  TLE's other two issues, this does not raise a disputed issue of material fact.  And because the

9  TLE has not raised any in opposition to the FTC's default-judgment motion, I find it unlikely

10  that such issues will arise later.  This factor therefore weighs in favor of granting default

11  judgment.

12  **V.      Defendant's excusable neglect**

13         The next *Eitel* factor looks to whether the TLE's default may have resulted from

14  excusable neglect.  I find that it did not.  The TLE concedes that it willingly participated in

15  settlement discussions after properly being served with process, stipulated to a preliminary

16  injunction, and was in consistent contact with the FTC.[75]  The TLE could have avoided default

17  by responding to the complaint by the deadline set by this court or requesting an extension to

18  prepare an answer once it knew a settlement was out of reach.  Instead, it chose to dissolve.  That

19  decision was not one of excusable neglect.  So, this factor weighs in favor of default judgment.

20

21

22

23  [74] ECF No. 92 at 6–7; *see also* ECF No. 92-5.

   [75] *See* ECF No. 92.

**VI.    Policy considerations**

Under the seventh and final *Eitel* factor, default judgments are generally disfavored because "[c]ases should be decided upon their merits whenever reasonably possible."[76] However, the TLE's decision to dissolve, rather than appear and defend, precludes adjudication on the merits.  And while this factor usually weighs against entry of default judgment, it does not preclude me from entering one and is outweighed by the other factors here.  Under these circumstances, default judgment is warranted.  The FTC is entitled to a default judgment against the TLE on all its claims.

<h2 style="text-align:center">Conclusion</h2>

**IT IS THEREFORE ORDERED** that the FTC's motion for default judgment **[ECF No. 91] is GRANTED**.  The Clerk of the Court is directed to **ENTER JUDGMENT** in favor of the Federal Trade Commission and against the La Posta Tribal Lending Enterprise and **CLOSE THIS CASE**.  And with good cause appearing and no just reason for delay, under Federal Rule of Civil Procedure 54(b), the Clerk is directed to immediately enter this order as a final judgment as to La Posta Tribal Lending Enterprise on the following terms:

**I.    Definitions**

For this order, the following definitions apply:

- "Consumer" means any Person.
- "Clear(ly) and conspicuous(ly)" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all the following ways:

---

[76] *Eitel*, 782 F.2d at 1472 (citing *Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985)).

- o In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented.  In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

- o A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

- o An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

- o In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

- o The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

- o The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

- o The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

- o When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

- "Corporate Defendants" means Lead Express, Inc.; Camel Coins, Inc.; Sea Mirror, Inc.; Naito Corp.; Kotobuki Marketing, Inc.; Ebisu Marketing, Inc.; Hotei Marketing, Inc.; Daikoku Marketing, Inc.; and each of their subsidiaries, affiliates, successors, and assigns.

- "Debt" means any obligation or alleged obligation of a Consumer to pay money, whether such obligation has been reduced to judgment.

- "Debt Collection Activities" means any activities to collect or attempt to collect, directly or indirectly, a Debt owed or due, asserted to be owed or due.

- "Defendants" means the TLE and all other defendants in this matter, individually, collectively, or in any combination.

- "Payment Schedule" means the number, amounts, and due dates or period of payments scheduled to repay a loan or other extension of credit.

- "Person" means a natural person, an organization or other legal entity, including a corporation, partnership, sole proprietorship, limited liability company, association, cooperative, or any other group or combination acting as an entity.

- "Receiver" means the receiver appointed in Section XI of the Stipulated Preliminary Injunction as to the Corporate Defendants entered by the Court on June 19, 2020, in this matter,[77] and any deputy receivers that shall be named by the Receiver.

---

[77] ECF No. 44.

14

- "TLE" means La Posta Tribal Lending Enterprise, also doing business as Harvest Moon Financial, Green Stream Lending, and Gentle Breeze Online, and its successors and assigns.

## II.   Injunctive relief

**IT IS FURTHER ORDERED** that the TLE, its officers, agents, and employees, and all other Persons in active concert or participation with them, who receive actual notice of this order by personal service or otherwise, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or offering of any loan or other extension of credit, are **permanently restrained and enjoined** from:

- Misrepresenting or assisting others in misrepresenting, expressly or by implication:
  - the number of payments any Person will withdraw from any Consumer's bank accounts;
  - the total payments that any Person will withdraw from any Consumer's bank accounts;
  - the amount of interest and principal payments that any Person will withdraw from any Consumer's bank accounts, or that such payments consist of both interest and principal repayment;
  - the Payment Schedule;
  - the total amount a Consumer will owe;
  - the interest rate(s), annual percentage rate(s), or finance charge(s), and whether they are fixed or variable;
  - whether the loan has a prepayment penalty or whether refinancing may trigger a prepayment penalty and/or other fees; or

15

o   any other material fact;

- Violating the Truth in Lending Act[78] or Regulation Z;[79]

- When extending a fixed amount of credit that a Consumer is to repay in one or more installment(s), failing to disclose in writing (electronic or hard-copy) and in a form the Consumer may keep, Clearly and Conspicuously, before the Consumer signs the credit agreement, the following information in a manner accurately reflecting the terms of the legal obligation between the parties:

  o   the amount financed;

  o   the finance charge;

  o   the annual percentage rate;

  o   the Payment Schedule; and

  o   the total of payments;

- Stating in any advertisement for any loan or other extension of credit, expressly or by implication:

  o   the amount or percentage of any down payment, the number of payments or period of repayment, the amount of any payment, or the amount of any finance charge, without disclosing Clearly and Conspicuously all the following terms:

    ▪   the amount or percentage of the down payment;

    ▪   the terms of repayment; and

---

[78] 15 U.S.C. §§ 1601–1667.

[79] 12 C.F.R. Part 226.

- the annual percentage rate, using the term "annual percentage rate" or the abbreviation "APR." If the annual percentage rate may be increased after consummation of the credit transaction, that fact must also be disclosed; or
  - a rate of finance charge without stating the rate as an "annual percentage rate" or the abbreviation "APR," using that term.

**IT IS FURTHER ORDERED** that the TLE, its officers, agents, and employees, and all other persons in active concert or participation with any of them, who receive actual notice of this order, whether acting directly or indirectly, are hereby **permanently restrained and enjoined** from misrepresenting, or assisting others in misrepresenting, expressly or by implication:

- Any aspect of any Debt Collection Activity, including but not limited to (a) that Consumers owe a Debt; (b) that Consumers can be arrested, prosecuted, or imprisoned for failing to pay any Debt; or (c) that any Person will or can take formal legal action against Consumers who do not pay any Debt, including but not limited to, filing suit or garnishment; and
- Any fact material to Consumers concerning any product or service, such as the total costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics.

**IT IS FURTHER ORDERED** that the TLE, its officers, agents, and employees, and all other persons in active concert or participation with any of them, who receive actual notice of this order, whether acting directly or indirectly, are hereby **permanently restrained and enjoined** from:

- Making electronic fund transfers from a Consumer's deposit, savings, or asset account on a recurring basis without:

  o obtaining a written authorization signed or similarly authenticated from the Consumer for preauthorized electronic fund transfers from the Consumer's account, which written authorization must (a) be readily identifiable as such and (b) the terms of the preauthorized transfer, including the amount of each transfer and the dates on which each transfer will be made, are clear and readily understandable; and

  o providing to the Consumer a copy of a written authorization signed or similarly authenticated from the Consumer for preauthorized electronic fund transfers from the Consumer's account; or

- Violating the Electronic Fund Transfers Act[80] or Regulation E;[81]

- Failing to provide sufficient customer information to enable the FTC to administer efficiently consumer redress.  If a representative of the FTC requests in writing any information related to redress, that the TLE must provide it, in the form prescribed by the FTC, within 14 days;

- Disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that any Defendant obtained

---

[80] 15 U.S.C. §§ 1693–1693r.

[81] 12 C.F.R. Part 205.

18

prior to entry of this order in connection with the marketing and extension of loans; and

- Failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after receipt of written direction to do so from a representative of the FTC.

- Provided, however, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

**IT IS FURTHER ORDERED** that the TLE, its officers, agents, and employees, and all other persons in active concert or participation with any of them, who receive actual notice of this order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, offering for sale, or selling of any product or service through telemarketing, are hereby **permanently restrained and enjoined** from:

- Creating or causing to be created, directly or indirectly, a remotely created payment order, including a remotely created check, as payment for such good or service;

- Violating the FTC's Telemarketing Sales Rule.[82]

**III.   Monetary relief**

**IT IS FURTHER ORDERED** that:

- All Consumer Debt for loans issued by the TLE before the May 19, 2020, Temporary Restraining Order issued in this case[83] ("Existing Debt") is hereby deemed paid in

---

[82] 16 C.F.R. Part 310.

[83] ECF No. 13.

full to the extent the amount paid by consumers on such Existing Debt exceeds the amount financed plus one finance charge (the "Paid in Full Debt").

- The TLE must not collect upon or make any attempt to collect upon; must not sell, assign, or otherwise transfer; and must not report to any consumer reporting agency, any Paid in Full Debt.

- The TLE must assign and transfer to the Receiver any Existing Debt that is not Paid in Full Debt.

**IT IS FURTHER ORDERED** that:

- **Judgment in the total disgorgement amount of $5,073,597, is entered in favor of the FTC and against the TLE, jointly and severally with any other defendant against whom judgment may be entered, with post-judgment interest at the legal rate.**

- This monetary judgment is enforceable against any asset, real or personal, whether located within the United States or outside the United States, owned jointly or singly by, on behalf of, for the benefit of, in trust by or for, or as a deposit for future goods or services to be provided to, any Corporate Defendant, whether held as tenants in common, joint tenants with or without the right of survivorship, tenants by the entirety, and/or community property.

- In partial satisfaction of the judgment against the TLE, any Defendant, financial institution, or any other Person, whether located within the United States or outside the United States, that holds, controls, or maintains accounts or assets of, on behalf of, for the benefit of, or as a deposit for future goods or services to be provided to, any Receivership Entity, whether real or personal, whether located within the United

States or outside the United States, must, within 10 business days from receipt of a copy of this order, transfer to the Receiver or his designated agent, such account or asset, including, but not limited to:

- o First National Bank Albany/Breckenridge must, upon written direction of the Receiver, transfer to the Receiver all funds, if any, in the following accounts: (1) account number xxxx8448 in the name of La Posta Tribal Lending Enterprise; (2) account number xxxx3141 in the name of Gentle Breeze, a division of La Posta Tribal Lending Enterprise; (3) account number xxxx3507 in the name of Gentle Breeze, a division of La Posta Tribal Lending Enterprise; (4) account number xxxx3568 in the name of Gentle Breeze, a division of La Posta Tribal Lending Enterprise; (5) account number xxxx3263 in the name of Harvest Moon Financial, a division of La Posta Tribal Lending Enterprise; (6) account number xxxx3629 in the name of Harvest Moon Financial, a division of La Posta Tribal Lending Enterprise; (7) account number xxxx3690 in the name of Harvest Moon Financial, a division of La Posta Tribal Lending Enterprise; (8) account number xxxx3202 in the name of Green Stream, a division of La Posta Tribal Lending Enterprise; (9) account number xxxx3751 in the name of Green Stream, a division of La Posta Tribal Lending Enterprise; (10) account number xxxx3812 in the name of Green Stream, a division of La Posta Tribal Lending Enterprise; and (11) any other account held in the name of the TLE;

- o PeopleFirst Bank must, upon written direction of the Receiver, transfer to the Receiver all funds, if any, in the following accounts: (1) account number

xxxx5760 in the name of Gentle Breeze; (2) account number xxxx5728 in the name of Green Stream Lending; (3) account number xxxx5784 in the name of Harvest Moon Financial; (4) account number xxxx5752 in the name of Gentle Breeze; (5) account number xxxx5736 in the name of Green Stream Lending; (6) account number xxxx5776 in the name of Harvest Moon Financial; and (7) any other account held in the name of the TLE;

- First Dakota National Bank must, upon written direction of the Receiver, transfer to the Receiver all funds, if any, in the following accounts: (1) account number xxxx9782 in the name of La Posta Tribal Lending Enterprise; (2) account number xxxx9322 in the name of La Posta Tribal Lending Enterprise d/b/a/ Gentle Breeze; (3) account number xxxx8212 in the name of La Posta Tribal Lending Enterprise d/b/a Green Stream Lending; (4) account number xxxx9232 in the name of Harvest Moon Financial, a division of La Posta Tribal Lending Enterprise; and (5) any other account held in the name of the TLE;

- CNB Bank & Trust, N.A. must, upon written direction of the Receiver, transfer to the Receiver all funds, if any, in the following accounts: (1) account number xxxx4144 in the name of La Posta Tribal Lending Enterprise d/b/a Gentle Breeze; and (2) any other account held in the name of the TLE;

- North American Banking Company must, upon written direction of the Receiver, transfer to the Receiver all funds, if any, in the following accounts: (1) account number xxxx6427 in the name of Gentle Breeze; (2) account number xxxx6468 in the name of Green Stream Lending; (3) account number

xxxx6443 in the name of Harvest Moon Financial; (4) account number xxxx6435 in the name of Gentle Breeze; (5) account number xxxx6476 in the name of Green Stream Lending; (6) account number xxxx6450 in the name of Harvest Moon Financial; (7) account number xxxx6708 in the name of Gentle Breeze, a division of La Posta Tribal Lending Enterprise; (8) account number xxxx6690 in the name of Green Stream Lending, a division of La Posta Tribal Lending Enterprise; (9) account number xxxx6682 in the name of Harvest Moon Financial, a division of La Posta Tribal Lending Enterprise; and (10) any other account held in the name of the TLE; and

o Chippewa Valley Bank must, upon written direction of the Receiver, transfer to the Receiver all funds, if any, in the following accounts: (1) account number xxxx6738 in the name of La Posta Tribal Lending Enterprise d/b/a Gentle Breeze; (2) account number xxxx6720 in the name of La Posta Tribal Lending Enterprise d/b/a Gentle Breeze; (3) account number xxxx6746 in the name of Harvest Moon Financial, a division of La Posta Tribal Lending Enterprise; (4) account number xxxx6753 in the name of Harvest Moon Financial, a division of La Posta Tribal Lending Enterprise; and (5) any other account held in the name of the TLE.

- The asset freeze is modified to permit the transfers identified in this section.

- The TLE relinquishes dominion and all legal and equitable right, title, and interest in all assets transferred under this order and may not seek the return of any assets.

- All money paid to the FTC under this order may be deposited into a fund administered by the FTC or its designee to be used for equitable relief, including

consumer redress and any attendant expenses for the administration of any redress

fund.  If a representative of the FTC decides that direct redress to consumers is

wholly or partially impracticable or money remains after redress is completed, the

FTC may apply any remaining money for such other equitable relief (including

consumer information remedies) as it determines to be reasonably related to

Defendants' practices alleged in the Complaint.  Any money not used for such

equitable relief is to be deposited to the U.S. Treasury as disgorgement.  Defendants

have no right to challenge any actions the FTC or its representatives may take under

this subsection.

**IV.    Order acknowledgments, compliance reporting and monitoring, and recordkeeping**

**IT IS FURTHER ORDERED** that the TLE must obtain acknowledgments of receipt of

this order:

- The TLE, within 7 days of entry of this order, must submit to the FTC an
  acknowledgment of receipt of this order sworn under penalty of perjury.

- For 5 years after entry of this order, the TLE must deliver a copy of this order to: (1)
  all principals, officers, and directors; (2) all employees having managerial
  responsibilities for conduct related to the subject matter of the order, and all agents
  and representatives who participate in conduct related to the subject matter of the
  order; and (3) any business entity resulting from any change in structure as set forth
  in the next subsection.  Delivery must occur within 7 days of entry of this order for
  current personnel.  For all others, delivery must occur before they assume their
  responsibilities.

- From each individual or entity to which the TLE delivered a copy of this order, the TLE must obtain, within 30 days, a signed and dated acknowledgment of receipt of this order.

**IT IS FURTHER ORDERED** that the TLE must make timely submissions to the FTC:

- One year after entry of this order, the TLE must submit a compliance report, sworn under penalty of perjury.  The report must (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the FTC may use to communicate with it; (b) identify all of its businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the products and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant; (d) describe in detail whether and how the TLE is in compliance with each section of this order; and (e) provide a copy of each order Acknowledgment obtained under this order, unless previously submitted to the FTC.

- For 20 years after entry of this order, the TLE must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in: (a) any designated point of contact; or (b) its structure or any entity that it has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this order.

- The TLE must submit to the FTC notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against it within 14 days of its filing.

- Any submission to the FTC required by this order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

- Unless otherwise directed by a FTC representative in writing, all submissions to the FTC under this order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580.  The subject line must begin: FTC v. Lead Express, X200033.

**IT IS FURTHER ORDERED** that, for the purpose of monitoring the TLE's compliance with this order, including the financial representations upon which part of the judgment was suspended and any failure to transfer any assets as required by this order:

- Within 14 days of receipt of a written request from a representative of the FTC, the TLE must submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying.  The FTC is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by

26

Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

- For matters concerning this order, the FTC is authorized to communicate directly with the TLE.  The TLE must permit representatives of the FTC to interview any employee or other person affiliated with it who has agreed to such an interview.  The person interviewed may have counsel present.

- The FTC may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to the TLE or any individual or entity affiliated with it, without the necessity of identification or prior notice.  Nothing in this order limits the FTC's lawful use of compulsory process under Sections 9 and 20 of the FTCA.[84]

**IT IS FURTHER ORDERED** that the TLE must create the following records for 20 years after entry of the order, and retain each such record for 5 years:

- Accounting records showing the revenues from all products or services sold;

- Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

- Records of all Consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

---

[84] 15 U.S.C. §§ 49, 57b-1.

- All records necessary to demonstrate full compliance with each provision of this order, including all submissions to the FTC; and

- A copy of each unique advertisement or other marketing material.

_____
U.S. District Judge Jennifer A. Dorsey
September 13, 2021